## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **EDRA D BLIXSETH**, | Case No.  **09-60452-7** |
| Debtor. | |
| **RICHARD J. SAMSON**, | |
| Plaintiff. | |
| -vs- | Adv No.  **10-00094** |
| **WESTERN CAPITAL PARTNERS LLC**, | |
| Defendant. | |

## MEMORANDUM of DECISION

At Butte in said District this 1st day of June, 2012.

Pending in this adversary proceeding are:  (1) Defendant Western Capital Partners, LLC's ("Western Capital") Motion for Partial Summary Judgment against Counts I and II of Plaintiff Richard J. Samson's Amended Complaint (Docket No. 95), and the objection thereto filed by the Trustee/Plaintiff; and (2) Plaintiff Richard J. Samson's Motion for Summary Judgment (Docket. No. 96) on all counts of the complaint against Western Capital, and the objection thereto filed by Western Capital.  The Court has reviewed both motions, objections, replies, statements of facts and issues, and applicable law.

1

JURISDICTION

The "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."  *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)).  In general, a bankruptcy court's jurisdiction is prescribed by 28 U.S.C. § 1334(b).  In addition to granting jurisdiction to bankruptcy courts over bankruptcy cases, the statute provides that  "the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

This Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b) as it arises in and relates to the above-captioned Chapter 7 case.  The Trustee asserts this is a core proceeding in which the Court has the authority to enter a final decision.  Western Capital counters that this is not a core proceeding and further argues it has not consented to entry of a final order or judgment by this Court and, based upon the United States Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594, 2608, 2615, 2620 (2011), instead requests that this Court enter proposed findings of fact and conclusions of law.

An action by a bankruptcy trustee to avoid and recover a preference or a fraudulent conveyance is a "core proceeding."  28 U.S.C. § 157(b)(2)(F) and (H).[1]  The foregoing applies to Counts I and III of the Trustee's Amended Complaint.  Count V of the Trustee's Amended Complaint, seeking to disallow Western Capital claim, is also "core" under 28 U.S.C. §

---

[1]  The Court agrees that Count II of the Trustee's Amended Complaint, which is founded on state law, is more problematic.  However, the Court need not address that issue at this time.

157(b)(2)(B).  Count VI is likewise core under 28 U.S.C. § 157(b)(2)(B) because it necessarily implicates the process of allowance, or disallowance, of Western Capital's claim as a creditor in this case under § 502(d) of the Bankruptcy Code.  As a core proceeding, Congress has instructed the bankruptcy court to "hear and determine ... and [to] enter appropriate orders and judgments [in the action] subject to [appellate] review under section 158 of [title 28]." 28 U.S.C. § 157(b)(1).

Under the facts and circumstances of this particular case, the Court agrees with the recent ruling of the Bankruptcy Court in Idaho:

> Congress has decided that a bankruptcy court should hear and decide a trustee's fraudulent conveyance claims arising in a bankruptcy case, a task that is particularly well-suited to the bankruptcy court's expertise. While it may be interesting to ponder whether, some day, the Supreme Court could, perhaps, determine that bankruptcy courts may not constitutionally enter final judgments on such claims, the Court did not do so in *Stern*.  Instead, the opinion in *Stern* makes clear that its holding should be limited to those cases where a state law counterclaim is asserted against a creditor, and where resolution of that counterclaim is not necessary to a determination of whether the creditor's claim should be allowed in the bankruptcy case.

> This is not a *Stern*-type case because: 1) Trustee's fraudulent conveyance claims against the County are not based on state law, but instead, stem solely from the bankruptcy case and arise exclusively under the Bankruptcy Code; and 2) resolution of Trustee's avoidance claims is necessary to determine the allowance or disallowance of the County's creditor claim in the bankruptcy case.  Moreover, if Trustee prevails, even if this Court lacks the constitutional power to finally decide Trustee's § 548 and § 544(b) claims against the County, the County can always request *de novo* review of this Court's findings and conclusions by the district court. Because of this, and because this Court has the unchallenged power to adjudicate Trustee's preference claim against the County, this is not an appropriate situation for withdrawal of reference by the district court.

*In re Bujak*, 2011 WL 5326038, *4-5 (Bankr. D.Idaho 2011) (slip copy).

For the reasons discussed above, the Court finds it has constitutional authority to enter a

3

final judgment on Counts I, III, V and VI of the Trustee's Amended Complaint.  This Memorandum includes the Court's findings of fact based on the parties' statements, and conclusions of law.

The Trustee's seeks in Count I of the Amended Complaint to avoid obligations incurred and payments made by Debtor in June 2007, additional collateral pledged in May 2008 and a garnishment in February 12, 2009, on grounds said obligations and transfers were fraudulent under 11 U.S.C. §§ 548 and 550 and further seeks in Count II to set avoid the same obligations and transfers pursuant to Cal. Civ. Code §§ 3439.04 and 3439.05, Mont. Code Ann. §§ 31-2-333 and 31-2-334, Colo. Rev. Stat. §§ 38-8-105 and 38-8-106, and other comparable state laws, and 11 U.S.C. §§ 544 and 550.  In Count III, the Trustee alleges that a transfer of $45,200.63 in cash to Western Capital is an avoidable preference under 11 U.S.C. § 547; in Count V, the Trustee seeks disallowance of Western Capital's claim; and in Count VI, the Trustee alleges Western Capital's loan was usurious under Montana law.[2]

### FACTS

Western Capital's "Statement of Undisputed Facts" (Docket No. 95-1) asserts the following uncontroverted facts:

> 1.  Plaintiff Richard J. Samson is the acting trustee for the chapter 7 bankruptcy estate of Edra D. Blixseth ("Edra"). (Mont. Bankr. Adv. Proc. 10-94, Dkt. No. 33 ¶ 1.)

> 2. WCP is a Colorado limited liability company with its principal place of business in Denver, Colorado. (Dkt. No. 33 ¶ 2; Ex. 1.)

> 3.  At all times relevant to this proceeding, Edra was a citizen and resident

---

[2] Count IV of the Trustee's amended complaint was previously dismissed.  *See Order* entered July 26, 2011, at docket entry no. 45.

4

of the State of California. (Dkt. No. 33 ¶ 10.)

    4.  Matthew D. Crocker is Edra's son ("Crocker"). (Dkt. No. 33 ¶ 12.)

## The Loan

    5.  On June 15, 2007, WCP made a loan in the principal amount of $13,065,000.00 (the "Loan") to Monarch GoBuild Construction, LLC ("Monarch GoBuild"); GoBuild, Inc. ("GoBuild"); Blue Sky Development, L.L.C. ("Blue Sky"); and Montana Specs LLC ("Montana Specs") (collectively, the "Borrowers"). (Dkt. No. 33 ¶ 17, Ex. 1.)

    6.  The purpose of the loan was to provide financing and working capital for the Story Mill project. (Ex. 2 at 13:21 – 15:17.) [Western Capital's exhibits show the loan matured June 14, 2009.  Further, the Trustee counters that the primary purpose of the loan was to fund construction on Lots 176 and 178.]

## The Borrowers - Monarch GoBuild

    7.  Monarch GoBuild was a Montana limited liability company. (Ex. 1.)

    8.  Monarch GoBuild was formed by Monarch Design, LLC ("Monarch Design") and GoBuild. (Ex. 3.)

    9.  Monarch Design owned a forty five percent interest in Monarch GoBuild. (Id.)

    10.  Monarch Design was wholly owned by Edra. (Ex. 4 at ¶ 3(d).)

    11.  GoBuild owned a fifty-five percent interest in Monarch GoBuild. (Ex. 3.)

    12.  Monarch GoBuild owned certain real property located at 49 Travertine Rd, Big Sky, MT 59716 f/k/a Lot 176 at the Yellowstone Club ("Lot 176") (Ex. 5.)

    13.  Lot 176 was a spec home built for potential Yellowstone Club members. (See Ex. 6.)

    14.  On or about September 25, 2007, Lot 176 was appraised at and had a value of $7,150,000.00. (Ex. 6.) [The Trustee counters that the evidence to support this valuation is not admissible.]

15.  Using proceeds from the Loan, WCP paid off a mortgage on Lot 176 in the amount of $4,002,334.96. (Ex. 7.)

**The Borrowers - GoBuild**

16.  GoBuild was a Montana corporation. (Ex. 1.)

17.  GoBuild f/k/a New Creation Cabinetry was formed by Crocker, and Crocker later became GoBuild's sole shareholder. (Ex. 8 at ¶ 20.)

18.  GoBuild was wholly owned by Crocker. (Id.)

19.  GoBuild was a construction company whose primary business was building and finishing spec homes in the Yellowstone club. (See Ex. 9.)

20.  GoBuild owned a fifty-five percent interest in Monarch GoBuild. (Ex. 3 at p. 2.)

21.  GoBuild owned certain real property known as Unit F of Jacobs Crossing Condominium (the "Bozeman Condo"). (Ex. 10.)

22.  On or about the time of the Loan, the Bozeman Condo was worth $325,000.00.  (Ex. 4.)

**The Borrowers - Blue Sky**

23.  Blue Sky was a Montana limited liability company. (Ex. 1.)

24.  Blue Sky was formed by Crocker, and Crocker was Blue Sky's sole member.  (Ex. 12.)

25.  Blue sky owned the real property commonly known as the Story Mill Project, located in Bozeman, Montana. (Ex. 8 at ¶ 30.)

26.  The Story Mill Project was a real estate development in a neighborhood slated to be annexed to Bozeman, Montana. (Ex. 13.)

27.  Edra had invested at least $19,500,000.00 in the Story Mill project. (Ex. 14.) [The Trustee disputes that this could be accurately characterized as an "investment," and instead argues Debtor could have loaned or gifted such funds for the benefit of the Story Mill project noting Debtor had no direct or indirect equity interest in the Story Mill project.]

6

28.  On or about September 24, 2007, the Story Mill Project was appraised at and had a value of $15,500,000.00. (Ex. 14 at 4.) [The Trustee counters that Western Capital presents no admissible evidence in support of this assertion, since the exhibit relied upon is not authenticated by any recognized method. The true value of Story Mill (after subtracting debt) was, according to the Trustee, zero. Among other things, former employees of Western Capital testified that Western Capital regarded the Story Mill project as a "pipe dream, silly project that was never going to get off the ground. It had, if I remember, umpteen million dollars of senior debt on it. We didn't think the value was—that there was any value beyond that senior debt."]

29.  At the time of the Loan, the Story Mill Project was encumbered only by a mortgage in the amount of $9,800,000.00 in favor of American Bank and a construction lien in the amount of $33,562.75. (Ex. 16 ¶ 73-74.) [The Trustee asserts there may be other debts against the property, including Western Capital's lien.]

30.  Blue Sky granted WCP a mortgage on the Story Mill Project to secure the Loan.  (Ex. 17.)

**The Borrowers - Montana Specs**

31.   Montana Specs was a Montana limited liability company. (Ex. 1.)

32.  Montana Specs was a special purpose entity that was formed for the sole purpose to hold title to real property securing the Loan. (Ex. 18.)

33.  Crocker owned all of the outstanding membership interests in Montana Specs.  (Ex. 18 ¶ 2.1.)

34.  Montana Specs had no assets other than Lots 176 and 178. (Ex. 18 ¶ 3.1.)

35.  Montana Specs had no other liabilities other than the Loan. (Ex. 18 ¶ 4.2.)

**The Loan Guaranties**

36.  WCP required Crocker and Edra, as owners of the Borrowers, to guarantee the loan personally. (Ex. 19, Ex. 20, Ex. 21, Ex. 2 at 34:18-35:11.) [The Trustee notes that Debtor was not a direct owner of any borrower.  (Def. Statement, ECF No. 95-1 at ¶¶ 5, 8, 18, 24, 33.) She held an indirect 45 percent interest in Monarch Gobuild Construction LLC (Def. Statement, ECF No. 95-1 at

7

¶¶ 9-10), a "borrower" with no material assets. Since loan proceeds were used for Story Mill (owned by Blue Sky) and Lots 176 and 178 (owned by Montana Specs), it does not appear that Monarch Gobuild actually borrowed any money. Its only material asset was transferred to Montana Specs LLC in connection with the Western Capital loan. (Def. Statement, ECF No. 95-1 at ¶¶ 12, 32, 34; Pl. Obj. Ex. 8, E. Blixseth Dep. 21:2-22 (mistakenly referring to Lot 178); Pl. Mot. Ex. 38, Adams Dep. 155:5-156:5.)]

37.  Edra agreed to unconditionally and irrevocably guarantee the payment when due of all indebtedness owed under the Loan. (Dkt. 33 ¶ 21, Ex. 19.)

38.  Edra agreed to unconditionally and irrevocably guarantee the timely performance of all obligations of the Borrowers in connection with the Loan. (Id.)

39. Edra had the financial capacity to repay the loan. (Ex. 22.) [The Trustee counters that Debtor did not have the financial capacity to repay the loan]

40.  Edra had a net worth of approximately $500mm at the time of the Loan. (Id.) [The Trustee disagrees that Debtor had a net worth of $500 million but rather, contends Debtor was insolvent on a balance-sheet basis in June of 2007.]

41.  Edra did not wish to disclose her financial status during her divorce, but she had her attorney prepare a letter stating she was worth more than $500mm. (See Id.) [The Trustee counters that the letter only states that it was "anticipated that Mrs. Blixseth will receive assets with a value in excess of $500 million."]

42.  Edra also granted WCP a security interest in all of her personal property. (Ex. 23.) [The Trustee agrees that Debtor's personal property guarantee was broad, but argues some property was not included in the guarantee.  For example, the Trustee argues a security interest  in deposit accounts require perfection by control, and not merely as a result of the filing of a UCC financing statement.  The Trustee also argues the personal guarantee did not extend to cover any of the marital community assets of Tim and Edra, since Edra did not have the power to pledge community assets to secure a separate debt.]

43.  Crocker agreed to unconditionally and irrevocably guarantee the payment when due of all indebtedness owed under the Loan. (Ex. 20.)

44.  Crocker agreed to unconditionally and irrevocably guarantee the timely performance of all obligations of the Borrowers in connection with the Loan. (Id.)

45.  Crocker had the financial capacity to repay the loan. (Ex. 11.) [The

8

Trustee argues Crocker did not have the financial capacity to repay the loan. The Trustee further maintains that Western Capital questioned the value of Crocker's collateral and his ability to perform on Story Mill, which is why it required Debtor to guarantee the loan.]

46. Crocker had a net worth of more than $18mm at the time of the Loan. (Id.) [The Trustee disagrees and counters that Crocker was insolvent on a balance-sheet basis, which is evidenced in part by the fact Crocker filed for bankruptcy relief less than two years after securing the loan from Western Capital.]

**The Primary Collateral**

47. WCP required Monarch GoBuild to pledge its ownership interest in Lot 176 to secure the Loan. (Ex. 8 at 1-2.) [The Trustee counters that Western Capital required Monarch Gobuild to transfer all of its interests in Lot 176 to Montana Specs LLC, which then granted a security interest in Lot 176 to Western Capital, thereby depriving Monarch GoBuild of any potential equity value in Lot 176.]

48. On or about June 14, 2007, Monarch GoBuild transferred ownership of Lot 176 to Montana Specs. (Ex. 5.)

49. On June 15, 2007, Montana Specs granted a mortgage on Lot 176 to WCP to secure the Loan. (Ex. 17.)

50. Crocker owned certain real property located at 56 Travertine Road, Big Sky, MT 59716 f/k/a Lot 178 at the Yellowstone Club ("Lot 178"). (Ex. 24.)

51. On or about September 25, 2007, Lot 178 was appraised at and had a value of $4,450,000.00. (Ex. 25.) [The Trustee contends this fact is not supported by any admissible evidence.]

52. On or about June 14, 2007, Crocker transferred ownership of Lot 178 to Montana Specs. (Ex. 24.)

53. Using proceeds from the Loan, WCP paid off a mortgage on Lot 178 in the amount of $2,621,321.75. (Ex. 7.)

54. On June 15, 2007, Montana Specs granted a mortgage on Lot 178 to WCP to secure the Loan. (Ex. 17.)

55. Montana Specs owned Lots 176 and 178 and clear of any liens, mortgages, deeds of trust, or other encumbrances except those necessary to secure

9

the WCP loan. (Ex. 26, Ex. 7.)

56. Crocker pledged his ownership interest in Montana Specs to WCP to secure the Loan. (Ex. 23.)

57. On June 15, 2007, GoBuild granted a mortgage on the Bozeman Condo to WCP to secure the Loan. (Ex. 17.)

58. On June 15, 2007, Blue Sky granted a mortgage on the Story Mill Project to WCP to secure the Loan. (Ex. 17.)

59. WCP's mortgage on the Story Mill Project was subordinate to a first position lien to American Bank securing a loan in the maximum amount of $9,800,000.00. (Ex. 16.) [The Trustee disputes Western Capital's use of the word "maximum."]

60. WCP's mortgage on the Story Mill Project was subordinate to a construction lien in favor of R&R Taylor Construction, Inc. in the amount of $33,562.75. (Id.)

61. On June 15, 2007, the Primary Collateral was worth $17,591,437.25, after subtracting liabilities not paid through the Loan. (Ex. 6, Ex. 15, Ex. 25, Ex. 11, Ex. 10, Ex. 16, Ex. 26.) [The Trustee contends this fact is not supported by any admissible evidence.]

**The Secondary Collateral**

62. WCP required Crocker and Edra, as guarantors, to sign a security agreement to secure the Loan (Ex. 23.)

63. The Security Agreements granted WCP a security interest in virtually all of Crocker's and Edra's personal property, wherever located. (Id.) [The Trustee argues the legal effect of the security agreement is limited by applicable law, including, among others, Edra's inability to pledge community assets, and a lack of perfection in Edra's deposit accounts as a result of an absence of control.]

**The Collateral Exchange**

64. On or around June 28, 2008, Edra desired to borrow up to $8 million from Wachovia. (Ex. 27.) [The Trustee contends this fact is not supported by any admissible evidence and that the document produced by Western Capital to support such assertion references a $3 million loan rather than an $8 million loan.]

10

65. Wachovia demanded Edra give Wachovia a security interest in Blxware, LLC, which Edra owned. (Ex. 27.) [The Trustee contends this fact is not supported by any admissible evidence.]

66. WCP's security agreement encumbered Edra's ownership interests in Blxware LC. (Ex. 23.)

67. To allow Edra to obtain the loan, WCP agreed to release its security interest in Edra's ownership interests in Blxware in exchange for a first deed of trust on a certain condo in Washington State (the "Bellevue Condo"). (Ex. 27.)

**Edra's Assets at the Time of the Loan**

68. The Trustee does not have any independent information regarding the value of Edra's assets or community asset. (Ex. 28 at 81:14-20.) [The Trustee agrees adds that he does, however, have information derived during the course of the execution of his duties as Trustee.]

69. On December 15, 2006, Edra filed for divorce from Timothy L. Blixseth ("Tim"). (Dkt. 33 ¶ 10.)

70. The Divorce Court appointed Tim as manager of the Community Assets. (Mont. Bankr. Adv. Proc. No. 10-88, Dkt. 1 ¶ 13.)

71. Edra and Tim did not divide all of the community assets as part of one, single division. (Ex. 4, Ex. 29, Ex. 30.)

72. Edra and Tim divided their community assets through two partial settlements and one final settlement. (Id.)

73. On May 29, 2007, the Superior Court for the State of California for the County of Riverside (the "Divorce Court") conducted a hearing regarding a partial division of community property (the "(Ex. 4.)".) (Ex. 4.)

74. At the May Hearing, Edra and Tim agreed to divide certain community assets. (Id.) [The Trustee does not dispute that Debtor and Tim discussed a division of certain community assets in May 2007, but notes that Edra testified that until "the document was executed, it wasn't a done deal, never, with us."]

75. On August 21, 2007, the Divorce Court entered an order approving the partial settlement (the "First Mini Settlement"). (Id.)

76. The Divorce Court's order approving the First Mini Settlement was

11

effective on May 29, 2007, the day of the May Hearing. (Id.) [The Trustee
disputes this fact, countering no part of the property division was final until it was
set down in writing.]

77. In the First Mini Settlement, the Divorce Court awarded Edra the
below property as her sole and separate property, subject to all liens, claims,
encumbrances, and obligation relating to the properties, and ordered Edra to pay
all claims and obligations relating to the properties so long as Tim did not cause
or create any such liens, encumbrances, or judgments.  The Court further ordered
Tim to pay any such liens, encumbrances, or judgments. The property
awarded to Edra in the First Mini Settlement is as follows:

a.      the real property located at Punta Bella, San Jose Del Cabo,
        Mexico, which consisted of a residence and one undeveloped lot
        ("Casa Captiva");

b.      a Gulfstream G-IIb aircraft, registration number N864YD (the
        "G-IIb");

c.      the real property located at 650 Bellevue Way, Suite 2304,
        Bellevue, Washington, including all furniture, furnishings, art
        work, antiques, and personal property therein (the "Seattle
        Condo");

d.      all interest in Monarch Designs and Monarch Investments, together
        with all assets and liabilities associated with the Monarch entities,
        including Monarch GoBuild;

e.      the real property located at 67380 Tawny Brown Lane, Bozeman,
        Montana.

f.      the real property located at 185 Andesite Ridge, Big Sky, Montana
        ("Lot 48"); and

g.      the real property located in Rancho Mirage, California (the "Big
        Horn Lot").  (Id.)

78.  On June 15, 2007, Casa Captiva was worth $22,500,000.00 and was
not encumbered. (Ex. 31.)  [The Trustee contends the exhibit relied upon by
Western Capital does not support such assertion and that the exhibit relied upon
by Western Capital is the Trustee's expert report, which assumes a value of
$22.5 million for Casa Captiva as part of his analysis, but contains no information
independently establishing that value. The exhibit also does not purport to

describe the extent of any liens on Casa Captiva.]

79. On September 16, 2008 Edra received a letter from Mexican Counsel wherein it was acknowledged that BLX Group, Inc. (formerly known as "Blixseth Group, Inc." was the legal owner of Casa Captiva. (Ex. 32.) [The Trustee contends the letter was from Debtor, rather than a letter to Debtor.]

80. The Trustee did not engage an appraiser to value Casa Captiva as of June 15, 2007. (Ex. 28 87:6-9.)

81. On June 15, 2007, the G-IIb was worth $5,000,000.00 and was not encumbered.  (Ex. 31.) [The Trustee disagrees, harkening back to Debtor's testimony that the aircraft was likely worth less.]

82. On June 15, 2007, the Seattle Condo was worth $3,000,000.00 and was not encumbered. (Id.) [The Trustee again asserts the exhibit is a Trustee's expert report, which assumes a value of $3 million for the Seattle condominium as part of his analysis, but contains no information independently establishing that value. The exhibit also does not purport to describe the extent of any liens on the Seattle condominium.]

83. On June 15, 2007, Lot 48 was worth $7,000,000.00 and was not encumbered.  (Id.) [The Trustee again asserts the exhibit is a Trustee's expert report, which assumes a value of $7 million for Lot 48 as part of his analysis, but contains no information independently establishing that value. The exhibit also not purport to describe the extent of any liens on Lot 48.]

84. Edra received title to Lot 48 on or about September 11, 2008. (Ex. 33.)

85. On June 15, 2007, the Big Horn Lot was worth $2,400,000.00 and was not encumbered. (Ex. 31.)  [The Trustee again asserts the exhibit is a Trustee's expert report, which assumes a value of $2.4 million for the Big Horn lot as part of his analysis, but contains no information independently establishing that value. The exhibit also does not purport to describe the extent of any liens on the Big Horn lot.]

86. In the First Mini Settlement, the Divorce Court awarded Tim the below property as his sole and separate property, subject to all liens, claims, encumbrances, and obligation relating to the properties, and ordered Tim to pay all claims and obligations relating to the properties so long as Edra did not cause or create any such liens, encumbrances, or judgments.  The Court further ordered Tim to pay any such liens, encumbrances, or judgments. The property awarded to Tim in the First Mini Settlement is as follows:

     a.      a Gulfstream G-IV aircraft, registration number N864YC;

     b.      the real property consisting of 160 acres, located in Big Sky, Montana (the "Family Compound"); and

     c.      the real property consisting of three residences located at Tamarindo, Mexico, but not including the resort property ("Tamarindo").  (Ex. 4.)

87.  The Trustee has not obtained any appraisals regarding the value of Edra's assets at the time of the loan. (Ex. 28 81:14-20.)

**Edra's Liabilities at the Time of the Loan**

88.  On June 15, 2007, Edra's debts totaled $8,451,000.00. (Ex. 31.) [The Trustee argues Ex. 31 shows debts of not less than $21,516,000.]

89.  The First Mini Settlement did not allocate any debts to Edra for payments, except for those debts related to the transferred property. (Ex. 4.)

90.  Edra projected that she would have adequate capital to maintain herself after significant borrowing. (Ex. 22.) [The Trustee disagrees, arguing Debtor lacked adequate capital to maintain herself.]

91.  Edra was paying her debts as they became due. (Ex. 34.) [The Trustee disagrees, arguing the report actually shows Debtor was accruing massive balances on her various credit lines.  The Trustee further maintains that other evidence shows Debtor was only paying debts by borrowing money, and that many debts were not being paid at all.]

92. On June 15, 2007, Edra attested to the fact that she was paying her debts as they became due. (Ex. 8.)

**Community Assets and Liabilities at the Time of the Loan**

93.  On August 2, 2007, Tim submitted a sworn statement to the California Family Court detailing the nature and value of all community assets and liabilities ("Tim's Divorce Schedule"). (Ex. 35.) [The Trustee adds the clarification that the exhibit relied upon for this statement required Tim to list all known community and separate assets, it also notes that discovery is ongoing and "assets and liabilities of the marital estate may not be listed."]

14

94.   Tim's Divorce Schedule, declared under penalty of perjury, lists every asset and debt known to be owned or owed by the community, excluding all assets awarded to either Tim or Edra through the First Mini Settlement. (Id.)  [The Trustee adds the clarification that the exhibit relied upon for this statement required Tim to list all known community and separate assets, it also notes that discovery is ongoing and "assets and liabilities of the marital estate may not be listed."]

95.   Although many of the listed assets were owned by single or special purpose entities, Tim's Divorce Schedule lists each asset by the underlying real or personal property. Id.

96.   Tim's Divorce Schedule lists asset values totaling $926,433,174.00 against liabilities of 232,207,280.00. (Id.)

97.   WCP created a chart as a demonstrative summary of the assets and liabilities from Tim's Divorce Schedule. (Id.)  The summary is found on pages 9 through 19 of Western Capital's Statement of Uncontroverted Facts.  At page 19, the summary lists total assets of $926,433,174.00 and total liabilities of $232,207,280.00.  [The Trustee disputes these amounts, noting several of the asset values appear overstated, such as the value assigned to the Yellowstone Mountain Club, and that the liabilities do not include substantial tax liabilities associated with the Credit Suisse loan and subsequent equity distribution.]

98.   Around the same time, Edra similarly filed a sworn statement of assets and liabilities ("Edra's Divorce Schedule"). (Id. at Ex. J (attached thereto).)

99. Edra's Divorce Schedule does not list any values for the major assets or liabilities of the community estate. (Id.)

100.   The Trustee has not engaged an appraiser to value any of the Community Assets as of June 15, 2007. (Ex. 28 at 81:14-20.)

**Edra's Liabilities Incurred After the Loan**

101.   The Trustee does not have an opinion as to when Edra became insolvent. (Ex. 28 at 80:16-19.) [Although the Trustee does not have an opinion as to when Debtor became insolvent, the Trustee believes Debtor was insolvent at the time of the Western Capital loan.]

102.   On July 20, 2007, Monarch Design borrowed $2,004,112.00 from Stockman Bank of Montana. This loan was secured by a mortgage on Lot 48, and Edra personally guaranteed the loan. The Trustee has not initiated any action to set

aside the guaranty as a fraudulent transfer. (Mont. Bankr. Case No. 09-60452 Proof of Claim 4-1.)

103.  On September 9, 2008, Edra borrowed $4,625,670.25 from Stockman Bank of Montana. This loan was secured by a mortgage on Lot 185, a property in the Yellowstone Club.  (Mont. Bankr. Case No. 09-60452 Proof of Claim 5-1.)

104.  On August 14, 2007, Edra Borrowed $202,000 from Stockman Bank of Montana.  This loan was secured by a mortgage on Lot 48. (Mont. Bankr. Case No. 09-60452 Proof of Claim 6-1.)

105.  On November 6, 2008, Edra Borrowed $148,748.00 from Stockman Bank of Montana. This loan was secured by a mortgage on Lot 48. (Mont. Bankr. Case No. 09-60452 Proof of Claim 7-1.)

106.  On August 1, 2008, Edra guaranteed an obligation owing from BGI to American Bank in the amount of $9,553,314.04, not including interest of $610,881.36. (Mont. Bankr. Case No. 09-60452 Proof of Claim 8-1.)

107.  In August through September 2008, Edra borrower $850,000.00 from various persons and entities in La Jolla, California. (Mont. Bankr. Case No. 09-60452 Proof of claim 12-16.)

108.  On August 13, 2008, Edra borrowed $35,000,000.00 from CIP Lending Inc./CrossHarbor Capital Partners LLC. (Mont. Bankr. Case No. 09-60452 Proof of claim 37-1.)

109.  On or about March 3, 2008, Edra guaranteed a loan purportedly made to BFI in the amount of $8,000,000.00, later increased to $10,000,000.00. The loan repaid a $5,000,000.00 obligation that Edra incurred subsequent to the WCP Loan. (Mont. Bankr. Case No. 09-60452 Proof of claim 57-1.)

110.  On September 4, 2007 and November 1, 2007, Edra engaged Deloitte LLP to provide auditing services, which eventually cost $981,430.98. (Mont. Bankr. Case No. 09-60452 Proof of Claim 72-1.)

111.  Between December 2006 and the petition date, Edra incurred attorney fees and costs in the amount of $1,089,253.02 for her divorce proceeding. (Mont. Bankr. Case No. 09-60452 Proof of Claim 73-1.)

**Edra's Liabilities Incurred through the MSA**

16

112.  Edra believed that she would receive valuable assets through the MSA. (See Mont. Bankr. Adv. Proc. No 10-88, Dkt. No. 1.)

113.  Edra paid more than $18 million to Tim to complete the MSA. (Id.)

114.  The Blixseth Community Assets had a net worth of at least $200 million one year after the Loan. (Id.) [The Trustee agrees that the community estate prior to its final dissolution was valuable. In dissolution, however, Tim received many of the valuable assets, leaving Edra with various substantial debts and valueless assets.]

115.  The Trustee is attempting to set aside the MSA to regain those assets. (Id.)

**Default and Edra's Bankruptcy**

116. On or around August 1, 2008, the Borrowers defaulted on the Loan. (Ex. 36.) [The Trustee counters that although the borrowers might have defaulted on the loan on or around August 1, 2008, in fact the earliest default came no later than December 6, 2007.]

117. The Borrower's default constituted a default by the Guarantors. (Ex. 19, Ex. 20.)

118.  On February 13, 2009, Crocker filed for protection under Chapter 7 of the Bankruptcy Code. (Mont. Bankr. Case No. 09-60139)

119.  On March 26, 2009 Edra filed for protection under Chapter 11 of the Bankruptcy Code. (Mont. Bankr. Case No. 09-60452, Dkt. 1.)

120.  On May 29, 2009, this Court ordered Debtor's case converted to a case under Chapter 7 of the Bankruptcy Code. (Mont. Bankr. Case No. 09- 60452, Dkt. 179.)

121.  On May 29, 2009, the United States Trustee appointed Richard J. Samson as Chapter 7 Trustee (the "Trustee"). (Mont. Bankr. Case No. 09-60452, Dkt. 182.)

122.  On October 21, 2010, the Trustee filed this action seeking to set aside Edra's guaranty and security agreement in the Secondary Collateral as a fraudulent transfer. (Mont. Bankr. Case No. 10-0094, Dkt. 1.) [The Trustee disagrees with such characterization, clarifying that he is seeking to overturn all obligations incurred and transfers made by Edra to or for the benefit of Western

17

Capital arising out of or in connection with the Western Capital loan, among other things.]

123.  On October 6, 2009, the Bankruptcy Court determined that the automatic stay did not apply to WCP based on operation of Section 362(h) of the Bankruptcy Code. (Mont. Bankr. Case No. 09-60452, Dkt. 514.) [The Trustee disagrees with Western Capital's characterization of the Court's order dated October 6, 2009, arguing the Court granted relief from the automatic stay with respect to particular items of property.]

124.  On or about December 14, 2009, WCP foreclosed on Edra's jewelry, yielding $97,552.00. (Mont. Bankr. Case No. 09-60452, Dkt. 673 at ¶ 2(d).)

125.  On or about December 15, 2009, WCP foreclosed on Edra's personal property located at Lot 48, yielding $256,308.00. (Ex. 37.)

126. On or about March 22, 2010, WCP foreclosed on Edra's interests in certain entities and accounts receivables, yielding $250,000.00. (Ex. 38.) [The Trustee only agrees that, on or about March 22, 2010, Western Capital foreclosed on Edra's interests in certain entities and accounts receivable, and credit bid $250,000 at the sale.]

127.  On or about August 14, 2010, WCP foreclosed on Edra's interest contract rights and claims arising out of certain personal property, yielding $250,000.00. (Ex. 39.) [The Trustee agrees that, on or about August 14, 2010, Western Capital foreclosed on Edra's interest in certain contract rights and claims and credit bid $250,000 at the sale. While $250,000 is the minimum value associated with those assets, the real value may be much higher because the Sandoval settlement was worth $1.25 million.]

128.  To date, the Secondary Collateral has yielded little value beyond the foreclosure price, and approximately $8 million remains unpaid on the Loan. (Mont. Bankr. Case No. 09-60452, Dkt. 673.) [The Trustee disagrees arguing the statement purports to define the amount remaining unpaid on the loan as of today's date, but only refers to evidence submitted as of March 29, 2010. Moreover, the defined term "Secondary Collateral" does not include all of the collateral that Western Capital has obtained pursuant to its loan, such as Edra's Bellevue condominium.]

**CrossHarbor and the MSA**

129.  On March 22, 2010, WCP foreclosed on Edra's interests in the MSA. (Ex. 38.)

130. WCP subsequently transferred its interests in the MSA to CrossHarbor to effectuate a settlement between WCP and CrossHarbor. (Mont. Bankr. No. 09-60452, Dkt. No. 863 at 3)

131. On February 23, 2010, the Bankruptcy Court granted WCP standing to pursue certain claims against CIP Yellowstone Lending, LLC/CrossHarbor. (Mont. Bankr. No. 09-60452, Dkt. No. 637.)

132. On May 17, 2010, the Bankruptcy Court granted the Trustee's motion to reconsider granting WCP standing to pursue claims against CIP/CrossHarbor. (Mont. Bankr. No. 09-60452, Dkt. Nos. 667, 669.)

133. The Trustee subsequently pursued certain claims against CIP/CrossHarbor. (Mont. Bankr. No. 09-60452, Dkt. No. 863)

134. The Trustee later settled those claims against CrossHarbor. (Id.; Mont. Bankr. No. 09-60452, Dkt. No. 956.)

135. I n consideration for dismissing the claims between the Estate and CrossHarbor, CrossHarbor paid the Estate $850,000.00. (Id.)

136. As additional, valuable consideration for dismissing the claims between the Estate and CrossHarbor, CrossHarbor transferred its interest in the MSA to the Estate. (Id.) [The Trustee disagrees that the contract claims arising out of the MSA were particularly valuable. Although those claims were additional consideration for the settlement with Cross Harbor, they were not the main driver for the settlement. The significant concessions leading to settlement were the payment of another $350,000 and waiver of any break-up fee or expense reimbursement.]

137. The Bankruptcy Court approved the settlement. (Mont. Bankr. No. 09-60452, Dkt. No. 956.)

138. The decision to approve the settlement was a close call. (Mont. Bankr. No. 09-60452, Dkt. No. 863 at 3) (Mont. Bankr. No. 09-60452, Dkt. 956 at 35.) [The Trustee disagrees that the decision to approve the settlement was a "close call," arguing Western Capital is misreading the Court's opinion on the issue. The Trustee argues that although the Court did conclude that one factor weighed against settlement, the Court also concluded that two other factors weighed in its favor, and that the last factor weighed "overwhelmingly in favor of settlement."]

139. The Trustee is now pursuing certain claims against Tim, seeking to

19

set aside the MSA. (Mont. Bankr. Adv. Proc. No. 10-88, Dkt. 1.)

**The Karas Report**

140. The Trustee retained Joe Karas to determine whether Edra was insolvent on June 15, 2007. (Ex. 31 at p. 1.)

141. Joe Karas issued a report allegedly demonstrating Edra's insolvency (the "Karas Report"). (Id.)

142. The Karas Report identifies Edra's liability for the WCP Loan as being for the full amount, $13,065,000.00. (Id. at p. 4.)

143. Mr. Karas evaluated only the property that Edra was awarded as her sole property through the Stipulation and Order for Partial Division of Property dated August 21, 2007. (Id. at p. 2.)

144. The Karas Report identifies Edra's "Assets per stipulation and Order" as being valued at $46,372,682.00. (Id. at p. 4.) [The Trustee maintains that Mr. Karas's report assumes assets, before adjustments, of $46,372,682.]

145. The Karas report identifies Edra's liabilities as being $11,118,345.00. (Id. at p. 4.) [The Trustee contends Mr. Karas's report applies liability adjustments of $11,118,345, but identifies total liabilities of $21,516,000.]

146. Mr. Karas removed Casa Captiva and Lot 48 from his calculations, thereby subtracting $29,500,000.00 from her assets. (Id. at pp. 2, 4.)

147. Mr. Karas removed Casa Captiva and Lot 48 from his calculations because "she did not hold clear title to these assets at June 15, 2007." (Id. at p. 2.)

148. The Karas Report identifies Edra's liabilities exceeding her assets by $5,045,152.00. (Id. at p. 4.)

149. The Karas Report lists as being approximately $8 million. (Id. at p. 4.) [The Trustee views this as a truncated sentence and is not sure what Western Capital means to refer to as being "approximately $8 million."]

150. The Trustee acknowledged that CIP/CrossHarbor had been assigned the Marital Settlement Agreement from WCP. (Mont. Bankr. No. 09-60452, Dkt. No. 863 at p. 3.)

20

## DISCUSSION

### I.  Summary Judgment.

Summary judgment is governed by FED. R. BANKR. P. 7056.  Rule 7056, incorporating

FED. R. CIV. P. 56(c), states that summary judgment "should be rendered if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  "The

proponent of a summary judgment motion bears a heavy burden to show that there are no

disputed facts warranting disposition of the case on the law without trial."  *Younie v. Gonya (In*

*re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive*

*Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).

When seeking summary judgment, the moving party must initially identify those portions

of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec.*

*Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving

party adequately carries its burden, the party opposing summary judgment must then "set forth

specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback*

*& Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED.

R. CIV. P. 56(e).  *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th

Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in

dispute").  That is, the opponent cannot assert the "mere existence of some alleged factual

dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct.

2505, 2510, 91 L.Ed.2d 202 (1986).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits

which are based on personal knowledge and the facts set forth therein must be admissible into

evidence.  *Aquaslide*, 85 B.R. at 547.  All reasonable doubt as to the existence of genuine issues

of material fact must be resolved against the moving party.  *Liberty Lobby,* 477 U.S. at 247-48,

106 S.Ct. at 2509.  If a rational trier of fact might resolve disputes raised during summary

judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W.*

*Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to deter-

mine whether the "specific facts" set forth by the nonmoving party, viewed along with the

undisputed background or contextual facts, are such that a rational or reasonable jury might

return a verdict in its favor based on that evidence.  *T.W. Elec. Serv.*, 809 F.2d at 631.  In the

absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled

to judgment as a matter of law.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

Before the Court are counter-motions for summary judgment filed by Western Capital

and  Plaintiff.  With regard to Counts I and II of Plaintiff's Amended Complaint, both sides claim

that no genuine issues of material fact exist, and that each is entitled to summary judgment as a

matter of law.

## II.     Avoidance under 11 U.S.C. §§ 548 and 550

Count I of the complaint is based on § 548 which provides in pertinent part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the debtor in
> property, or any obligation (including any obligation to or for the benefit of an
> insider under an employment contract) incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily--

22

\* \* \*

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

The temporal requirement under § 548 is two years.  The loan at issue in this case was made in June of 2007 and Debtor sought protection under the Bankruptcy Code on March 26, 2009.  The temporal requirement of § 548 is met.

The next inquiry under § 548 is whether Debtor received less than a reasonably equivalent value in exchange for the transfer she made and the obligation she incurred in June of 2007.  As explained by the Ninth Circuit Court of Appeals, "the primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors." *Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004). *See also, In re United Energy Corp.*, 944 F.2d 589, 597 (9th Cir. 1991) ("[T]he analysis is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost.")  A party "receives reasonably equivalent value if it gets roughly the value it gave." *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 441-42 (Bankr.

23

D. Idaho 2008).  Cal. Civ. Code §§ 3439.04 and 3439.05, like § 548, apply to transfers made or obligations incurred without receiving a reasonably equivalent value in exchange for the transfer or obligation.

*In re Grigonis*, 208 B.R. 950, 956 (Bankr. D. Mont. 1997), this Court held that a "totality of the circumstances" test should be used to determine reasonably equivalent value, which is a fact issue.  "The trustee bears the burden of showing that a transfer was not for reasonably equivalent value." *In re Rodriguez*, 895 F.2d 725, 726 n.1 (11th Cir. 1990); *see also Burdick v. Lee*, 256 B.R. 837, 839 (D. Mass. 2001).  The question of whether or not reasonably equivalent value was provided in exchange for a transfer is clearly a question of fact.  *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990).  "Reasonably equivalent value is the value of the property on the date of the transfer from the perspective of the creditors." *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010).  Generally, a transfer may not be avoided under § 548(a)(1)(B) if it conferred upon a debtor any direct or indirect economic benefit.  *See, Rodriguez*, 895 F.2d at 727.

In a case involving criminal restitution, a Florida bankruptcy court adopted a two-step approach to determine whether reasonably equivalent value was received in a transaction.  The first step involved determining "whether the debtor received any value at all in exchange for the transfer." *In re Tower Envtl., Inc.*, 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998).  "The inquiry in the first step of the analysis is whether the debtor obtained 'any benefit ... whether direct or indirect, without regard to the cost of ... services, the contractual and arm's length nature of the relationship, and the good faith of the transferee.'" *Id*.  In the absence of immediate direct benefit, courts should look to whether there was any "chance of obtaining any substantial

24

economic benefit in the future" as a result of the transfer.

The second step involves looking at the totality of the circumstances to determine whether the value, whether direct or indirect, was reasonably equivalent to the obligations incurred or the amounts transferred. *Tower* explains that the totality of the circumstances test involves looking at several factors, including: (1) the fair market value of the opportunity compared to the amount of the transfer; (2) the arms-length (or collusive) nature of the transaction; and (3) the good faith (or lack thereof) of the transferee. *Tower*, 260 B.R. at 225.

Using the two-step approach discussed above, the court in *Tower* concluded that resolution of criminal charges conferred economic benefit upon a debtor if the transfer secured a future opportunity for economic benefit, whether or not such benefit actually materialized. *Tower,* 260 B.R. at 226-27. Following such reasoning, execution of a personal guarantee may, under *Tower*, be sufficient economic benefit to defeat a trustee's claim under § 548. Such determination, however, must be made on a case-by-case basis.

Western Capital asserts that it made a loan in June of 2007 to Monarch GoBuild, GoBuild, Blue Sky and Montana Specs. Debtor, through Monarch Designs, owned a 45% interest in Monarch GoBuild. Just prior to the loan, Monarch GoBuild owned Lot 176, which according to Western Capital, was worth $7,150,000, and was encumbered by a mortgage in the amount of $4,002,334.96. As part of the loan process, Western Capital required that Monarch GoBuild pledge its ownership interest in Lot 176 to secure the loan. To that end, Lot 176 was transferred to Montana Specs on or about June 14, 2007. Thus, according to Western Capital, Debtor, as part of the loan process, transferred her 45% ownership interest in Lot 176, which according to Western Capital, had a value of $1,416,449.27 ($7,150,000 less $4,002,334.96

25

multiplied by 45%). Debtor also unconditionally and irrevocably personally guaranteed the loan, pledging the bulk of her personal property as security for Western Capital's loan to Monarch GoBuild, GoBuild, Blue Sky and Montana Specs.

Western Capital argues the Trustee cannot prevail on his § 548 claim because the loan was oversecured when made, and that Debtor's liability, which was "negligible at best[,]" was "secondary, not primary, and must be discounted to account for the probability that, on June 15, 2007, she would be required to pay." Brief in Support of Motion for Partial Summary Judgment, docket entry no. 95-43, p. 9. Western Capital further argues Debtor "received nearly $2 million in direct, tangible benefits,[3] in addition to the indirect benefits she received by the enhanced value of the Story Mill Project, in which she has invested $19.5 million." *Id.*

The Trustee counters that Western Capital was not relying on any of the Primary Collateral for payment but rather, was anticipating that Debtor would repay the $13,065,000.00 loan by the June 14, 2009 maturity date with proceeds from her divorce settlement. The divorce settlement did not produce proceeds with which to repay the $13,065,000.00 loan. The Trustee maintains on page 6 of his Objection to Western Capital Partners' Motion for Partial Summary Judgment, docket entry no. 104, that the Borrowers defaulted on the loan as early as December 2007. Western Capital maintains in its Statement of Uncontroverted Facts that the Borrowers defaulted on the loan around August 1, 2008.

---

[3] The $2 million in direct and tangible benefit asserted by Western Capital is the payoff of the existing loan of $4,002,334.96 on Lot 176, for which Debtor was not personally liable. In exchange, Debtor assumed personal liability for the $13,065,000.00 loan and also agreed that Monarch GoBuild could transfer Lot 176 to Montana Specs. As noted earlier, based upon the values provided by Western Capital and without considering the personal liability on the $13,065,000.00 loan, the transfer of Lot 176 from Monarch GoBuild to Montana Specs in and of itself resulted in a net detriment to Debtor of $1,416,449.27.

On the issue of reasonably equivalent value, the Trustee's separate Motion for Summary Judgment filed April 27, 2012, and Western Capital's objection thereto echo the arguments discussed above.  All matters considered, the Court concludes that the only item of value that Debtor could possibly have received from the loan transaction with Western Capital was the desire of a mother to see her son succeed financially.  While such value may have been monumental to Debtor, the fact that Debtor agreed personally to guarantee a loan in excess of $13 million and release the interest she had in Lot 176 could not, under any circumstances, be viewed by Debtor's creditors as conferring any benefit upon Debtor, whether direct or indirect and Western Capital has similarly failed to assert any fact or facts which would suggest Debtor had any "chance of obtaining any substantial economic benefit in the future" from her personal guarantee and the transfer of Lot 176 to Montana Specs.  The Trustee has satisfied the first prong of § 548 by showing that Debtor did not receive reasonably equivalent value when she agreed to transfer Lot 176 from Monarch GoBuild, in which Debtor held a 45% ownership interest through Monarch Designs, to Montana Specs, and when she agreed to assume personal liability for the $13,065,000.00 loan.

The second prong of § 548 requires the Trustee show that Debtor: (1) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (2) was engaged in businesses and transactions for which her remaining property was unreasonably small capital; (3) had incurred debts that were beyond her ability to pay as those debts matured; or (4) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.  Item 4 above is, by its own terms, not applicable to this

proceeding.

The Trustee asks this Court to judicially estop Western Capital from arguing Debtor was

solvent in July 2007 based upon a complaint filed by Western Capital against Debtor wherein

Western Capital argued that as of May 24, 2007, "the debt liabilities of the Debtor and/or her

'community estate' exceeded, if not vastly exceeded, the value of the Debtor's assets and/or the

assets of the community estate." *See* Adversary Proceeding No. 09-00100, docket entry no. 1.

Subsequently, in a motion for summary judgment filed August 20, 2010, in Adversary

Proceeding No. 09-00100, Western Capital stated, in its Statement of Uncontroverted Facts:

> 22.  On July 27 2007, just weeks after WCP advanced funds under the Loan Agreement, Debtor signed a declaration under penalty of perjury in her divorce proceedings in which she represented to the California Superior Court that she was several months in arrears to her creditors and that such arrears totaled $2 million. (See Conant Affidavit at ¶ 3, and Edra Deposition, Exhibit 15 at pp. 1:9-10, 9, ¶ 3, attached as Exhibit 3 to Conant Affidavit).

> > a. In her July 27, 2007 sworn declaration under oath, Debtor specifically stated, "…I am presently in arrears to creditors in the approximate amount of two million dollars, even after using all of the proceeds from the sale of my real estate parcel. These debts are primarily due to the ordinary expenses of Porcupine Creek, and they are increasing by the hundreds of thousands of dollars per month." (P.10, ¶ 3 of Exhibit 3 to Conant Affidavit).

> 30.  Debtor also misrepresented the fact that she was involved in pending litigation when she executed the Loan Affidavit and Loan Modification, and when she provided the May 24, 2007, Letter, as follows:

> > a.  When Debtor executed the Loan Affidavit and the Loan Modification, she was either already involved in litigation or knew that she was being threatened with imminent litigation. Specifically, Debtor was a Western Capital in at least the following cases:

> > > i.      Case Nos. 3:06-cv-00056 and 3:06-cv-00145 in the United States District Court for the District of Nevada (hereinafter "Nevada Litigation");

ii.     Cause Nos. DV-29-2006-26 and DV-29-2007-5 in the Montana 5th Judicial District, Madison County.  See, Complaint at ¶55(d) and Answer at ¶32).

31.  In the Nevada Litigation, Debtor personally executed a Confession of Judgment in favor of Warren Trepp in the amount of $5 million (see Edra Deposition, Exhibit 33, at p. 5, attached as Exhibit 5 to Conant Affidavit), and a Confession of Judgment in favor of eTreppid Technologies, LLC, in the amount of $20 million (see Edra Deposition, Exhibit 34, at pp 1-2, attached as Exhibit 6 to Conant Affidavit). (See generally Conant Affidavit at ¶ 6).

In considering the Trustee's judicial estoppel argument, it is important to understand that "[j]udicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  "The purpose of judicial estoppel is not to protect the litigants; it is to protect the integrity of the judicial system." *In re Coastal Plains*, 179 F.3d 197, 210 (5th Cir. 1999); *see also Hamilton*, 207 F.3d at 782 (doctrine used to "protect against a litigant playing fast and loose with the rules.") The Ninth Circuit in *Hamilton* also explained that "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,'  and thus no threat to judicial integrity."  270 F.3d at 782-83 (citations omitted).

In Adversary Proceeding No. 09-00100, the Court denied Western Capital's motion for summary judgment and the Adversary Proceeding was eventually dismissed by agreement of Western Capital and Debtor.  Because Western Capital did not "succeed" in Adversary Proceeding No. 09-00100, the Court declines to expand the doctrine of judicial estoppel beyond its intended scope, particularly when this Court is not presently faced with the risk of inconsistent determinations.

29

After reviewing the pleadings filed in this Adversary Proceeding and after review of the applicable law, the Court is not able to conclude that a reasonable juror could find in favor of either the Trustee or Western Capital on the second prong of § 548 and thus, summary judgment is not appropriate.[4]  However, the Court would note that whether Western Capital believed Debtor was solvent in June of 2007 is not important under § 548 and Debtor's July 27, 2007, sworn declaration under oath may prove problematic for Western Capital at trial.

For the reasons discussed above, the requests for summary judgment on Count I of the Amended Complaint are denied.  The requests for summary judgment on Count II of the Amended Complaint are similarly denied.

### III.    Avoidance under 11 U.S.C. § 547

Next, the Trustee requests entry of judgment in favor of the Trustee on the preference claim for $45,200.63 because Western Capital seized the money out of a bank account in which it had no security interest, and did so within the preference period.  The Trustee's preference action is governed by 11 U.S.C. § 547, which in relevant part provides:

(b) Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property —

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such

---

[4]  "[U]nder this 'balance sheet' test a debtors is insolvent when its liabilities exceed its assets."  *Wolkowitz v. Breath of Life Seventh Day Adventist Church (In re Lewis)*, 401 B.R. 431, 437 n.9 (Bankr. C.D.Cal. 2009) (quoting *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 277 (9th Cir. BAP 1989)**.**  Section 101(32) of the Bankruptcy Code defines "insolvent" to mean, with respect to individuals, "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of – (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title ...."  *Id.*

transfer was made;
        (3) made while the debtor was insolvent;
        (4) made –
                (A) on or within 90 days before the date of the filing of the
                petition. . . ; and
        (5) that enables such creditor to receive more than such creditor would
receive if –
                (A) the case were a case under chapter 7 of this title;
                (B) the transfer had not been made; and
                (C) such creditor received payment of such debt to the extent
                provided by the provisions of this title.

Western Capital garnished Debtor's bank account on or about February 12, 2009. Debtor

filed her bankruptcy petition on March 26, 2009. Subsections 1, 2 and 4 of § 547(b) are satisfied.

It also appears subsection 3 is satisfied because Western Capital admits that Debtor was insolvent

when Western Capital garnished Debtor's checking account. *See* Western Capital's Statement of

Genuine Issues, docket entry no. 102, pp 18-19. The only unresolved issue is whether the

Trustee has satisfied prong 5 under § 547(b)(5). The Court finds a material issue of fact as to

prong 5 and thus denies the Trustee's request for summary judgment on this issue.

**IV. Usury**

Finally, the Trustee requests entry of judgment in favor of the Trustee on the usury claim

because Western Capital charged both a default rate of 15 percent and a loan origination fee of

$783,900, resulting in a combined interest rate that exceeded the maximum rate allowed under

Montana law. Western Capital, quoting *Olympic Coast Inv., Inc. v. Wright (In re Wright)*, 256

B.R. 626, 634 (Bankr. D. Mont. 2000), counters that Colorado law applies because Colorado had

the most significant relationship, and "the validity of a contract will be sustained against the

charge of usury if it provides for a rate of interest that is permissible in a state to which the

contract has a substantial relationship and is not greatly in excess of the rate permitted by the

general usury law of the state of the otherwise applicable law . . . ."  Western Capital concedes that Colorado and Montana both have a substantial relationship to the contract.  However, Western Capital argues the interest rate does not greatly exceed the Montana usury statute and consequently, Colorado law applies.

The parties agree that the Loan carried an initial interest rate of 11 percent per annum, compounding monthly over the 24-month term of the Loan; that Western Capital charged a loan origination fee of $783,900; that the origination fee, in the amount of $783,900, was paid by being deducted from the original loan disbursements; and that Western Capital began charging a default rate of interest of 15 percent per annum on September 1, 2008.

In Montana, interest is "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money and includes loan origination fees, points, and prepaid finance charges, as defined in 12 CFR 226.2."  MONT. CODE ANN. ("MCA") § 31–1–104. Montana law further provides that non-regulated lenders may not charge a rate of interest that exceeds fifteen percent or which is six percentage points above the New York prime rate as reported in the Wall Street Journal three business days before the transaction in question.  MCA § 31–1–107.  On the subject of usury, the Supreme Court of Montana writes:

> It is, of course, elementary that "a contract or obligation for the payment of a sum of money larger than that actually lent to or due from the debtor is usurious if the difference between the face amount of the obligation and the sum actually received or owed by the debtor, when added to the interest, if any, stipulated in the contract, exceeds the return permitted by law upon the sum actually so received or due."

*Bowden v. Gabel*, 105 Mont. 477, 76 P.2d 334, 336 (1938).

Two prior rulings by this Court are also instructive.  First, in *Brummer v. TMG Life Ins. Co., Inc. (In re Brummer)*, 11 Mont. B.R. 287, 147 B.R. 552 (Bankr. D. Mont. 1992), my

predecessor, Judge John L. Peterson, recognized that "[a]s a federal Court, [we are] bound to follow an interpretation of state law by the highest state court." *Brummer*, 147 B.R. at 555. Judge Peterson then proceeded to adopt, in cases where a note is not facially usurious, the spreading doctrine, which allocates the total interest provided for in a loan agreement over the full term of the loan. *Id*. at 559.

Second, in *In re Wright*, *supra*, Judge Peterson held that even though disclosure of APR or the Annual Percentage Rate may not be required under a note, "APR provides persuasive guidance on whether an interest rate charged by a lender is usurious." 147 B.R. at 638. The Court in *Wright* also recognized that while additional fees and charges, such as finance charges and origination fees, which are deemed to constitute "interest," should be added to the stated amount of interest agreed upon by the parties when computing whether a contract contains a usurious rate of interest, not,

> every fee or charge is considered interest for "it is equally well settled that 'a lender may properly exact from a borrower, in addition to interest at the highest lawful rate upon the money lent, reasonable fees or compensation for services rendered, or reimbursement of expenses incurred, in good faith, by the lender or his agent, in connection with the loan, without thereby rendering the transaction usurious, even though the services rendered or acts done be such as would ordinarily be performed by the lender in his own interest.'" *Bowden v. Gabel*, 105 Mont. 477, 76 P.2d 334, 336 (1938).

*Wright*, 256 B.R. at 637.

Because the Trustee does not assert, in his Statement of Uncontroverted Facts in Support of Motion for Summary Judgment, that Montana, rather than Colorado law applies, the Court declines to consider the usury claim on summary judgment. The Trustee' request for summary judgment on this point is, therefore, denied.

The Trustee's request to deny Western Capital's Proof of Claim is necessarily tied to the foregoing. Therefore, the Court exercises its discretion and declines to consider the Trustee's

request to deny, at this time, Western Capital's claim.  For the reasons set forth above, the Court

will enter a separate order providing as follows:

**IT IS ORDERED** Defendant Western Capital Partners, LLC's Motion for Partial

Summary Judgment against Counts I and II of Plaintiff Richard J. Samson's Amended Complaint

filed at docket entry no. 95, and Plaintiff's Motion for Summary Judgment filed at docket. entry

No. 96, are denied in accordance with the Court's Memorandum of Decision.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana