UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

Debtor.

Case No. **09-60452-7**

**RICHARD J. SAMSON**,

Plaintiff.

-vs-

**WESTERN CAPITAL PARTNERS LLC**,

Defendant.

Adv No. **10-00094**

## MEMORANDUM of DECISION

At Butte in said District this 18th day of March, 2013.

In this Adversary Proceeding, trial was held June 6, 7, 8 and 11, 2012, in Missoula,

Montana. Plaintiff Richard J. Samson ("Samson") was represented at trial by David B. Cotner of

Missoula, Montana, and Hugh Robert McCullough and Anthony Wisen of Seattle, Washington.

Defendant Western Capital Partners, LLC ("Western Capital") was represented at trial by Robert

W. Hatch, II, Joseph John Novak, and Daniel J. Vedra of Denver, Colorado. Samson (the

Chapter 7 Trustee appointed in Debtor's main bankruptcy case), Matthew Crocker, Debtor Edra

Blixseth ("Debtor"), Jeffrey D. Adams ("Adams"), Joseph N. Karas, Raymond L. Dozier,

1

Kristina A. Cook, and Don Bailey ("Bailey") testified.  Samson's Exhibits 2, 7, 8, 11, 12, 13, 14, 17, 18, 20, 22, 24, 30, 32, 34, 36, 38, 39, 40, 41, 47, 50, 53, 56, 57, 58, 68, 69, 73, 74, 75, 76, 79, 91, 96, 97, and 98, and WCP's 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 22, 23, 24, 25, 26, 29, 30, 31, 32, 33, 35, 36, 37, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59, 69, and 70, were admitted into evidence.  Excerpts of Jeffrey Adams's and Don Bailey's deposition transcripts, identified as Samson's Exhibits 84 and 86, were not admitted into evidence because both individuals testified at trial.  Excerpts of the deposition transcripts of Timothy L. Blixseth ("Blixseth") and Brian Shloss ("Shloss"), identified as Exhibits 85 and 90, were admitted into evidence, and WCP was granted leave to file counter designations.  WCP filed its counter designations on September 18, 2012, at docket entry no. 132.  The Court tentatively admitted excerpts from Jory Russell's 2004 examination, and granted WCP leave to file counter designations.  The Court, however, reserved a final ruling on the admissibility of the Jory Russell excerpts, which final ruling is addressed herein.  At the conclusion of the trial, the Court granted the parties leave to file post-trial briefs.  Samson's post-trial brief was filed August 13, 2012, WCP's post-trial brief was filed September 4, 2012, and Samson's reply was filed September 11, 2012.  The matter is ready for decision.

## JURISDICTION

WCP contends, in the Final Pre-Trial Order, that this Court lacks jurisdiction to hear the matters raised by the Trustee and enter a final order or judgment thereon.  WCP also argues that Samson lacks standing to assert his claims as a result of 11 U.S.C. § 362(h).  Notwithstanding the foregoing, at trial, WCP consented to this Court's entry of a final judgment. All matters, considered, this Court finds that it has jurisdiction of this cause under 28 U.S.C. § 1334, and that

2

this is a core proceeding under 28 U.S.C. § 157(b).  This Memorandum of Decision includes the

Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

<strong>FACTUAL BACKGROUND</strong>

### I.     Debtor and Blixseth

In the late 1990s, Debtor and Blixseth began developing the "Yellowstone Club," which

was, and still is, a members only master-planned unit development, situated on 13,500 acres of

private land in Madison County near Big Sky, Montana.  Until August of 2008, the Yellowstone

Club was owned and operated by Blixseth through four companies, namely Yellowstone

Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone

Club Construction Company, LLC.  From their inception to August 12, 2008, Yellowstone

Mountain Club, LLC and Yellowstone Development, LLC were controlled by Blixseth through

his holding company, Blixseth Group, Inc. ("BGI").  Between August of 2001 and August of

2008, BGI owned 82.6532 percent of the Class A stock in Yellowstone Mountain Club, LLC and

Yellowstone Development, LLC, and Blixseth Family Investments, LLC owned 5.1020 percent

of Class A stock.  The Class B Members, or Class B Shareholders, owned 12.25 percent of

Yellowstone Mountain Club, LLC and Yellowstone Development, LLC.  From 1999 to mid-

August 2008, Blixseth was the sole owner, President, and CEO of BGI, an Oregon sub-S

corporation.

In late 2004 or early 2005, Debtor was serving as the Chief Operating Officer of the

Yellowstone Club.[1]  During that same time, Blixseth and Credit Suisse began negotiating the

---

[1] Blixseth contends Debtor was never involved is his business activities except that when
Blixseth started the Yellowstone Club, Debtor "was generally there as the cheerleader and the
person that from time to time was – housekeeping answered to and some of the food and

terms of a loan whereby the Yellowstone Club would borrow $125 to $150 million from Credit

Suisse.  The Yellowstone Club's management team, which consisted of Debtor as the Chief

Operating Officer, Denise Tuohy, Charlie Callander, Hank Kashiwa, Bob Sumpter and Bruce

Bales, felt comfortable that the Yellowstone Club entities could service a $150 million debt

obligation.  According to Debtor, the management team concluded $150 million was "a

reasonable amount" that would allow the Yellowstone Club to continue operating.  However, a

"huge controversy" ensued when the loan amount began to creep up during the course of

Blixseth's negotiations with Credit Suisse.

Blixseth, who Debtor referred to as a "self-proclaimed benevolent dictator," ultimately

caused certain of the Yellowstone Club entities to borrow $375 million from Credit Suisse in

September of 2005.[2]  The consensus of the management team was that the Yellowstone Club did

not have the financial wherewithal to service the $375 million loan.

On the day the loan was funded, Credit Suisse got "a substantial amount" for putting the

loan together.  Also, Blixseth transferred another $209 million of the loan proceeds from the

Yellowstone Club entities to their parent company, BGI.  The following day, Blixseth transferred

$209 from BGI to "accounts [Blixseth] had set up under 'TLB,' Timothy L. Blixseth."

Debtor explained that the Credit Suisse loan provided Blixseth and Debtor with "an

extreme amount of cash flow that, that we hadn't had because we -- although we had acquired a

_____

beverage people answered to."

    [2]  On the flip side, Blixseth characterized Debtor as "a spendaholic who would write bad
checks on an absolute over and over basis, and she thought there was an unending well of money
and, you know, she was an out-of-control spender."  Blixseth stated that Debtor was asking for
money from him "virtually monthly."

4

lot of assets and a lot of business and a lot of high-profile, you know, looking things, we always were kind of under the gun, let's say, of needing to make it work."

With funds from the Credit Suisse loan, Blixseth bought yachts and airplanes. Blixseth also used the Credit Suisse loan proceeds to purchase, in March of 2006, properties around the world including the Chateau de Farcheville in France, a golf resort property in Manzanillo, Mexico (often referred to as Tamarindo), a private island in the Turks and Caicos which included a 30,000 square foot mansion, and a property located in the Kingdom of Fife, Scotland, commonly referred to as the St. Andrews Property. Blixseth's March 2006 real estate purchases were part of his plan to take his Yellowstone Club concept worldwide.

Blixseth also used $11,939,598.24 of the Credit Suisse loan proceeds to payoff an existing obligation owed to First Bank on a line of credit that Blixseth had used to build his and Debtor's residence in Rancho Mirage, California, which was commonly referred to as Porcupine Creek. Porcupine Creek was also going to be available for use by members of Yellowstone Club World. The Porcupine Creek property is a 265 acre "trophy property", which included a 18,380 square foot estate residence with four guest suites, four additional guest houses, a private 19-hole PGA golf course, and two homes located on Gardess Road that were used for operations. When asked whether any of the foreign properties or Porcupine Creek were income producing, Debtor responded "absolutely not." Debtor described the upkeep and maintenance costs associated with the foregoing properties as "extremely significant."

Unfortunately, Blixseth's hopes of taking the Yellowstone Club concept worldwide failed "in reality, and in concept[.]" Blixseth sold only eight Yellowstone Club World memberships at a price of $1.5 million each.

5

The lack of interest in the Yellowstone Club World project left Blixseth and Debtor saddled with numerous properties that did not produce income, and in fact, required large sums of money for general upkeep.  Blixseth testified the expenses associated with Porcupine Creek alone were at least $500,000 per month.

Blixseth's use of the Credit Suisse loan proceeds also caused unrest at the Yellowstone Club, particularly when on May 31, 2006, Class B Shareholders Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc. (the "LeMond Plaintiffs"), filed a complaint in Madison County, Montana, captioned *LeMond v. Blixseth Group, Inc.*, C.V. No. DV-29-06-26 (the "LeMond Litigation"), complaining that the $209 million Blixseth took from the Yellowstone Club entities was a distribution, not a loan.  The LeMond Plaintiffs, as shareholders in the Yellowstone Club, argued they were entitled to their proportionate share of the distributions under Yellowstone Mountain Club, LLC and Yellowstone Development, LLC's applicable operating agreements.[3]

Debtor testified that "the Credit Suisse loan was the beginning of the end of [her] personal and business relationship with [Blixseth.]"  Debtor and Blixseth separated and in December of 2006, Debtor filed a petition for dissolution of marriage in the Superior Court of the State of California for the County of Riverside ("Superior Court of California").  Blixseth and Debtor attempted to project their divorce to the public as an amicable divorce that was settled over a bottle of wine and a yellow legal pad.  The divorce, however, was long, costly and acrimonious.

---

[3]  Blixseth, on behalf of himself and the named Yellowstone Club entities, settled the LeMond Litigation for $38 million.

## II.    The Story Mill project.

During the period of time when Blixseth and Debtor were developing the Yellowstone Club, Debtor's son, Matthew Crocker ("Crocker"), was seeking to develop an approximately 100-acre mixed use project in Bozeman, Montana known as the Story Mill project.  In the process of assembling the real estate for the project, Crocker, though Blue Sky Development, LLC, purchased the century-old Story Mill flour warehouse and an adjacent trailer court. According to Crocker, Blixseth provided the initial capital for the project and was teaching Crocker about project financing.

Crocker testified that during construction of the Warren Miller Lodge at the Yellowstone Club, Blixseth dissolved his partnership with Crocker and discontinued further financing of Story Mill.  The deterioration of Crocker's relationship with Blixseth coincides with the period of time just prior to the date when Debtor filed her petition for dissolution in the Superior Court of California.

By June of 2007, Crocker had acquired all the property associated with the Story Mill project and was in the process of trying to obtain final approval of his design by the City of Bozeman.  At that time, Crocker's sole source of income was from his cabinetry business, which, historically, had been a very flexible company that "had the ability to grow and shrink as it was needed."  Unfortunately, the focus of Crocker's business had been on projects in which Blixseth was involved.  Consequently, when Blixseth ended his financial involvement with Crocker, it essentially destroyed Crocker's ability to generate income and cash flow.

Once Crocker lost his financial backing from Blixseth, he turned to his mother, the Debtor in this case, for further financial backing. Crocker testified Debtor made several loans to

the Story Mill project, but never expected repayment. The evidence suggests Debtor invested in excess of $19 million in Story Mill. However, when Debtor's funds "were in trouble and drying up," Crocker began looking for other sources of funding.

One such source of alternative funding was a loan Crocker obtained from American Bank on December 15, 2006. A Commitment for Title Insurance dated May 22, 2007, shows Story Mill was subject to a $9.8 million loan in favor of American Bank. American Bank's mortgage was recorded December 26, 2006. That same Commitment for Title Insurance shows Blue Sky Development, LLC owed $11,315.97 in delinquent taxes on Story Mill. Story Mill was also encumbered by a construction lien in the amount of $33,562.75, plus interest, recorded May 11, 2007, in favor of R & R Taylor Construction, Inc.

### III.   Lots 176 and 178 at the Yellowstone Club and Unit F of Jacobs Crossing Condominium.

In conjunction with his cabinetry business, Crocker formed GoBuild, Inc. in 1999 and thereafter, in late 2000, Debtor formed an entity known as Monarch Design, LLC. At some point, Monarch Design, LLC acquired a commercial building in Bozeman, Montana described as Lots 6 and 7 of Cougar Park Industrial Subdivision.[4]

In 2003, either Crocker or Debtor formed Monarch GoBuild Construction, LLC.

---

[4] Monarch Design, LLC previously borrowed $1 million from American Bank on November 13, 2006. In connection with the loan, Debtor executed and delivered to American Bank a commercial guaranty, absolutely and unconditionally guaranteeing full payment of Monarch Design, LLC's indebtedness under the Promissory Note. The Promissory Note was due on demand and if no demand was made, all outstanding principal plus all accrued unpaid interest was due in one payment on October 31, 2007. Per a change in terms dated November 15, 2007, the final payment due date was extended to October 31, 2008. As of November 26, 2008, the amount owing under the Promissory Note was $1,012,481.25, plus interest in the amount of $247.50 per diem. On December 11, 2008, American Bank commenced an action against Debtor and Monarch Design, LLC for the amount owed.

Monarch GoBuild Construction, LLC was owned 45 percent by Monarch Design, LLC and 55 percent by Monarch GoBuild Construction, LLC.  Debtor and Crocker formed Monarch GoBuild Construction, LLC for the purpose of building spec homes.  Debtor explained that she and Crocker agreed that GoBuild, Inc. would be the general partner and Monarch Design, LLC and/or Debtor would provide the construction financing.

In early 2007, Monarch GoBuild Construction, LLC owned Lot 176 at the Yellowstone Club, and Debtor and Crocker, through Monarch GoBuild Construction, LLC were in the process of building a spec home on Lot 176.  American Bank had a first position lien on Lot 176.  As of June 15, 2007, the amount owed on the lien on Lot 176 totaled $4,002,334.96.  Jeffrey Adams ("Adams") testified that he believed the as-if-completed value of Lot 176 was something in the neighborhood of $7 million in 2007.

In early 2007, Crocker also owned Lot 178 at the Yellowstone Club.  Crocker was building another spec home on Lot 178.  American Bank had a first position lien on Lot 178.  As of June 15, 2007, American Bank was owed a total of $2,621,321.75 for the obligation secured by Lot 178.  Adams believed the as-if-completed[5] value of Lot 178 in 2007 was between $4 and $5 million.

During that same time, GoBuild, Inc., an entity owned by Crocker, owned Unit F of Jacobs Crossing Condominiums in Bozeman, Montana.  GoBuild, Inc. owned Unit F free and clear of any liens.  As of June 15, 2007, the only amounts owed on the Jacobs Crossing Condominium were property taxes in the amount of $3,669.45.

---

[5]  As of June 15, 2007, the homes on Lots 176 and 178 were in the construction phase and were not completed.  Adam's estimation of values was based on what the homes were worth had they been completed.

9

## V.        Debtor's Technology Companies.

At the time Debtor filed the petition for dissolution, she had invested $10 million in xPatterns, LLC and $8 million in Opspring, LLC.  Opspring, LLC and xPatterns, LLC[6] are or where both technology-related companies.  In 2006, Debtor became one of two directors in xPatterns, LLC.  Opspring, LLC, at some point, had hired Dennis Montgomery as chief scientist. Dennis Montgomery had previously been employed by eTreppid Technologies, LLC.  Prior to March 31, 2007, eTreppid had filed an action in the United States District Court for the District of Nevada asserting claims against Opspring and others, alleging that Dennis Montgomery had converted eTreppid property, interfered with and misappropriated eTreppid's business relationships, and misappropriated eTreppid's trade secrets.  In connection with the Nevada litigation, Debtor paid an attorney by the name of Michael Flynn approximately $1.9 million. Debtor eventually terminated Michael Flynn, who then went on to represent Blixseth in actions against Debtor.  Following a mediation in the Nevada action, Debtor agreed to pay eTreppid Technologies and/or Warren Trep a $6 million settlement, in addition to a percentage of the profits from Debtor's technology companies.  If Debtor was unable to pay the settlement as agreed, an automatic default was triggered whereby Debtor had to pay the entire amount of the settlement, which Debtor believed was $26 million.

In late 2006 and early 2007, Debtor's business relationship with Michael Sandoval, the other investor in xPatterns, LLC, began to deteriorate.  In March of 2007, Debtor and Michael Sandoval entered into a Letter Agreement which was intended to dissolve the business

---

[6] Debtor made two investments of $5 million each in xPatterns, LLC in 2006.  Debtor was supposed to make a third payment of $5 million on December 27, 2006, but failed to do so.

relationship between Debtor and Michael Sandoval. For instance, Debtor was supposed to receive back her $10 million investment in xPatterns, LLC[7] and was also to receive Opspring, LLC. Michael Sandoval was to receive xPatterns, LLC. Debtor was also supposed to pay Michael Sandoval a quarterly performance fee. The dispute between Debtor and Michael Sandoval, and the technology-related companies, is still ongoing in related Adversary Proceeding No. 09-00105.

According to Debtor, Opsring, LLC and xPatterns, LLC were start-up companies that had negative cash flow in 2007. When questioned about the value of Opsring, LLC and xPatterns, LLC in 2007, Debtor explained:

> [T]he only worth that I attributed to them was what I had loaned to those companies as start-up companies to hopefully develop something that would be revenue-driven, and I would hopefully eventually get back what I had loaned to them.

Blixseth was never involved with either Opsring, LLC or xPatterns, LLC.

### IV.    Blixseth Family Investments, LLC

At the time of their separation, Debtor and Blixseth each had a 30% ownership interest in Blixseth Family Investments, LLC ("BFI"). The remaining 40% of BFI was owned equally by the Beau Blixseth Trust, the Morgan Blixseth Trust, Matthew Crocker and Julie Barve. As of June 2007, BFI's sole asset was an approximately $24.49 million note payable from S.P. Realty, LP, an entity owned by James J. Dolan.[8] The note payable from S.P. Realty, LP was not accompanied by any real estate documents and was not secured by a mortgage, trust indenture or

---

[7]  xPatterns, LLC repaid Debtor $2 million of her $10 million investment.

[8]  James Dolan was a prior partner in the Yellowstone Club and Blixseth's partner in Western Pacific Timber.

Uniform Commercial Code security agreement.

In late July 2007, Edra and her children, Julie Barve and Crocker, prepared a document that sought to expel Blixseth from BFI. Debtor argued that as of July 17, 2007, BFI had no cash available, despite having received a $6.8 million payment from S.P. Realty on April 2, 2007. In lieu of having to provide an accounting of S.P. Realty's 2007 payment to BFI, Blixseth agreed on November 1, 2007, to assign his 30% ownership interest in BFI to Edra, giving Edra a 60% ownership interest in BFI.

On December 13, 2007, Blixseth and Debtor, as trustees of the Beau Blixseth and Morgan Blixseth Trusts, conveyed each of the Trusts' 10% ownership interests in BFI to Beau Blixseth and Morgan Blixseth individually. Pursuant to MONT. CODE ANN. ("MCA") § 72-33-412, if the principal of a trust does not exceed $20,000, the trustee has the power to terminate a trust without court approval. Based upon such statutory provision, Blixseth and Debtor, on January 1, 2008, executed two Trust Termination Agreements, terminating the Beau Blixseth Trust and the Morgan Blixseth Trust, and directing that the Trust principal, if any, be distributed to Beau and Morgan Blixseth.

S.P. Realty, LP made a payment of $4,875,696 to BFI on January 14, 2008. S.P. Realty, LP has not made a payment to BFI since January 14, 2008.

**VI.     The Western Capital Loan.**

WCP is a Colorado limited liability company with its principal place of business in Englewood, Colorado. WCP started in 1999 with four members or partners. WCP eventually expanded to seven senior partners and four junior partners, and between 1999 and 2009, WCP loaned $300 million in "bridge" loans. All WCP's loans have real property collateral in addition

12

to Uniform Commercial Code security interests.  WCP has not closed a loan since 2009.  WCP currently has four partners.

In 2007, Crocker was – after Blixseth terminated his involvement in the Story Mill project and after Debtor's funds were, according to Crocker, "in trouble and drying up" – searching for funds to further develop Story Mill and to build spec homes.  Crocker learned of WCP.

Adams testified during cross-examination that in 2007, he learned that WCP had "been offered the opportunity to do a large loan, anywhere between $5 and $15 million for a billionaire and her son."  WCP was, in part, interested in Story Mill because WCP had been trying to get more involved in green or LEED[9] certified projects, such as the Story Mill project.

On May 21, 2007, Bailey and others from WCP met Crocker in Bozeman, Montana.  Debtor flew in for the meeting in her personal Gulfstream jet, which according to Debtor, was her normal form of transportation in June of 2007.  Debtor told Bailey at that time that she had already invested $19.5 million in Story Mill and she wanted to help her son in any way she could.  The deal was enticing to WCP because Blixseth had, on September 21, 2006, been ranked as number 322 on the *Forbes* 400 list of wealthiest individuals in America, Debtor was jet-setting around in her personal jet, and the Wall Street Journal was reporting that Blixseth and Debtor's divorce had been settled on a yellow legal pad over a bottle of wine.

Notwithstanding the foregoing, or perhaps because of the foregoing, WCP followed its standard protocol of requiring, in addition to a security interest in Story Mill, Lots 176 and 178 and the Unit F condominium, personal guarantees from Debtor and Crocker.  Bailey explained

---

[9]  LEED stands for Leadership in Energy and Environmental Design.

13

that personal guarantees were a material component of their loans.  Debtor did not oppose

signing a personal guarantee for her son.

When asked about the importance of Debtor's personal guarantee and meeting with

Debtor, Bailey testified that it was essential that he meet with Debtor because he "wanted to look

her in the eye and have her tell [him] that she was going to pay [WCP] back as a guarantor,

which we do every time we go to visit the guarantors and the principals, and/or principals of the

project."  As Bailey explained, WCP "relied on [Edra's] guarantee to induce us to do the loan

because she was clearly running the show when we met her."  Furthermore, Crocker's financials

gave WCP pause for concern because his finances were tied up in Story Mill, two homes and a

membership in Blixseth Family Investments, LLC, which were all "illiquid assets."  According to

Adams, WCP was relying on being paid back with proceeds from Debtor's divorce settlement

and the sale of Lots 176 and 178.  WCP only took Story Mill as collateral in an "abundance of

caution."  Shloss, who worked for WCP and was involved in the loan process, described Story

Mill as "a pipe dream, silly project that was never going to get off the ground.  It had, if I

remember, umpteen million dollars of senior debt on it.  We didn't think the value was – that

there was any value beyond that senior debt."

As part of their due diligence, WCP asked to see Debtor's financial statements.  Debtor

refused to provide WCP with her financial statements or tax returns because of the divorce

situation.  In lieu of financial statements or tax returns and as a condition to loaning Crocker

money, WCP instead required Debtor to provide a written statement regarding her financial and

legal condition from her legal counsel so that WCP could evaluate and corroborate statements

made by Debtor and be assured that Debtor was in a financial position to guaranty repayment of

14

the loan.  Accordingly, Debtor's attorney William S. Ryden of Jaffe & Clemens in Los Angeles,

California sent WCP's counsel, Robert W. Hatch, III, a letter dated May 24, 2007, which reads:

> You have advised me that you are representing a financial group which is considering making a loan to Mrs. Blixseth and are requesting general information from me which will give the group assurance that the loan will be repaid.
>
> It appears from a preliminary review of the assets of the estate, all of which were accumulated by Mr. and Mrs. Blixseth since their marriage, which would make them community property, total in excess of $1 billion dollars.
>
> Under normal California law, it is anticipated that Mrs. Blixseth will receive assets with a value in excess of $500 million dollars.
>
> One of the assets which we anticipate being received by Mrs. Blixseth is the residential property known as "Porcupine Creek."  Our best estimate of the value of that property exceeds $200 million dollars.
>
> I do not believe that the group should have any concerns in making the loan to Mrs. Blixseth.

Consistent with the foregoing, Bailey testified that Debtor told him she had a divorce settlement

and that "it was just getting papered, and that she would be receiving quite a bit of money from

that divorce and would free up her assets that were currently a part . . . of the divorce."  When

pressed, Debtor told WCP that in the worst case, she could secure a loan using Porcupine Creek

as collateral and pay WCP in full.  Debtor represented that Porcupine Creek was an asset she

owned free and clear.  WCP confirmed that Porcupine Creek was indeed an unencumbered asset

in June of 2007.  However, Porcupine Creek was owned by BGI and in June of 2007, Blixseth

was the sole shareholder of BGI.

Bailey, during his testimony, summarized WCP's belief regarding Debtor's net worth:

> Well, from everything we could gather it seemed like it was at least a half a billion dollars; plus, she did arrive in her Gulfstream-something; she had this Porcupine Creek free and clear; she had, you know, part ownership in another lot

15

in Yellowstone Club, I think it was 48, if I remember. So, you know, when you just add it all up -- of course, Matt kept telling us she was a billionaire, but I think we concluded that she was at least worth half a billion dollars.

At the request of WCP, Debtor and Crocker also agreed that Lot 176 could be transferred to a single purpose entity. On June 4, 2007, Montana Specs, LLC was formed with Crocker holding 100% of the ownership interest. On June 14, 2007, Monarch GoBuild Construction, LLC transferred Lot 176 to Montana Specs, LLC. At trial, the parties disagreed on whether WCP precluded Debtor from having an ownership interest in Montana Specs, LLC.

Crocker and WCP quickly reached an agreement as to the loan amount and terms, and the loan closed on June 15, 2007. The total amount of the loan was $13,065,000.00, and interest accrued at the rate of 11 percent.[10] The Promissory Note had a maturity date of June 14, 2009. The Promissory Note also had a default rate of interest of 15 percent per annum, compounded monthly after "such due date." WCP was the lender and Montana Specs, LLC, Monarch GoBuild Construction, LLC, Gobuild, Inc., and Blue Sky Development, LLC were the borrowers. Montana Specs, LLC was a Montana limited liability company. Monarch GoBuild Construction, LLC was a Montana limited liability company. Gobuild, Inc. was a Montana corporation. Blue Sky Development, LLC was a Montana limited liability company. Crocker and Debtor signed a Loan Affidavit on June 15, 2007, affirming that "none of the Borrowers, nor Guarantors are: (i) currently insolvent on a balance sheet basis; or (ii) currently unable to pay their debts as they come due." Crocker and Debtor further affirmed that neither of them had any "delinquent tax obligations, including, without limitation, federal income tax, state income tax,

---

[10] The Court takes judicial notice that the Wall Street Journal or U.S. (Fed) prime rate of interest on June 15, 2007, was 8.25 percent.

16

withholding tax, sales tax, or personal property tax obligations."

Debtor's personal guarantee of the $13,065,000 loan included an after acquired property clause. Debtor made—either directly or indirectly--payments totaling in excess of $4.5 million to WCP between May 30, 2007, and September 9, 2008.

While Debtor did not know where Crocker's loan with WCP closed, Debtor testified that all the collateral for the WCP loan was located in Montana, Debtor signed the guaranty in Bozeman, Montana and at that time, Crocker was living in Bozeman. Crocker agreed that he was living in Bozeman at the time of the loan. Crocker's address on the Guaranty Agreement is listed as Portland, Oregon, but Crocker explained that was the address of the architectural firm with whom he was working.

Debtor testified the documents she signed in connection with the loan had not been provided to her prior to signing and that she "ran by and signed and ran off." Debtor then went on to explain that she does not recall seeing or reading the loan documents because she probably asked "Can you have sig pages ready? I'm rushing, and I've got to sign." At that time, Debtor understood she "was a guarantee backed up by Matthew's guarantee supported by the asset that he was pledging." While Debtor was not opposed to signing a personal guarantee so Crocker could get the loan from WCP, Debtor did not learn until approximately June of 2008 that she had in fact given a security interest to WCP on all her personal assets. Debtor testified that if she would have known that WCP was requesting that she pledge all her personal assets for the loan, she would have said "absolutely" not.

Per the Loan Settlement Statement, $6,623,656.71 of the loan proceeds went to American Bank to pay the amounts owing on Lots 176 and 178, $11,133.83 were used to pay the 2007

17

taxes on Lots 176 and 178, $3,669.45 were used to pay the 2006 and 2007 taxes owing on the Jacobs Crossing condominium, and $90,890.06 were used to pay the 2006 and 2007 taxes owing on Story Mill.

Early on, Debtor had hoped to receive some of the proceeds from the WCP loan.[11] However, when the loan was finalized, Crocker testified he could not give Debtor any money because "we were in a dire state, and so we needed that money immediately for operating capital and for our debts, and all of that...  The money trickled in just enough to, to pay off a few creditors, and this and that, kind of keep us alive."

It was not long before Crocker defaulted on the WCP loan, prompting WCP to send Crocker and Debtor emails and letters advising that the loan was in default.  On October 27, 2008, WCP sent Crocker and Debtor another letter advising that "the Loan is in default as a result of the Borrowers' . . . failure to timely make the interest payments for the months of August, September and October, 2008.  As a result, the Loan  has been accelerated and interest has been accruing at the rate of 15% per annum."

**VII.    Debtor and Blixseth's Divorce.**

Debtor and Blixseth separated on or about December 1, 2006, and a Petition for dissolution was filed on or about December 15, 2006, in the Superior Court of California. Debtor testified that California, which is a community property state, automatically imposes a restraining order on a separated person's ability to encumber or transfer assets.  At some point, the Superior Court of California appointed Blixseth as manager of the community property.

---

[11]  Shloss confirmed that based upon meetings with Debtor and Crocker, he believed "there was an unspoken understanding that funds [from the WCP loan] would be used to – for the day-to-day operations of – or the day-to-day lives of the guarantors."

Debtor testified that Blixseth, upon being appointed manager of the community property, froze Debtor out of virtually all businesses, leaving Debtor no access to any cash flow because Blixseth "controlled everything." Debtor explained that between December 2006 and May of 2007, she paid her bills on an irregular basis by "borrow[ing] where [she] could to support the obligations that [she] had to keep[.]" To cover some of her obligations, Debtor secured a $2.5 million loan from Palm Desert National Bank in April of 2007. While Debtor's access to cash was quickly dwindling, Blixseth continued to maintain some assets, such as Porcupine Creek which, according to the evidence, could cost as much as $750,000 per month to operate and maintain. When Debtor complained about her cash situation to the divorce court, she was told "there can only be one captain of the ship[.]"

The Superior Court of California held a hearing on May 29, 2007, at which Debtor and Blixseth agreed to the division of certain assets. As a result of the May 29, 2007, hearing, the Superior Court of California entered a Stipulation and Order for Partial Division of Property, Pendente Lite Payment of Expenditures and Miscellaneous Issues, which was signed by Debtor and Blixseth on August 21, 2007, and entered that same date ("Mini Settlement One"). Pursuant to Mini Settlement One, Debtor was to receive, as her sole and separate property, a property located in Mexico known as "Casa Captiva," a G-IIb aircraft, a condominium located in Bellevue, Washington, Monarch Designs[12], Lot 48 at the Yellowstone Club, and a lot in Rancho Mirage, California referred to as the "Big Horn Lot." Per Mini Settlement One, Blixseth was to

---

[12] Debtor testified that Monarch Designs included Monarch Design, LLC and its interest in Monarch GoBuild Construction, LLC. The reference to Monarch Designs in Mini Settlement One also included Monarch Investments, LLC, which owned the commercial building in which Monarch Design, LLC and Monarch GoBuild Construction, LLC operated.

19

receive a G-IV aircraft, a property in Mexico referred to as Tamarindo, and the 160-acre Blixseth Family Compound located at the Yellowstone Club.  Debtor and Blixseth agreed at the May 29, 2007, hearing, that Debtor would have exclusive use of Porcupine Creek for the six-month period beginning May 29, 2007, through and including November 29, 2007.

Following the May 29, 2007, hearing and in accordance with Mini Settlement One, which had not yet been approved, Debtor obtained control of the G-IIb aircraft, the Bellevue condominium, Monarch Designs and the Big Horn Lot.  Debtor testified that as of May 2007, she thought the value of the Monarch Design entities was $5,669,000.00, the value of the Big Horn Lot was between $2 and $2.5 million, and the value of the Bellevue condominium, including furniture, fixtures and equipment, was approximately $3 million.  Debtor had no idea of the value of Casa Captiva or Lot 48, but noted that Blixseth had assigned a value of $20 to $25 million and $7 million, respectively, to those two assets.[13]  Debtor did not receive control of Casa Captiva in 2007.

After May 2007, Debtor was responsible for the expenses associated with Casa Captiva and some of the expenses associated with Lot 48.  According to Debtor, the May 29, 2007, settlement added to her financial pressure because she had more bills to pay.  Debtor immediately sold the Big Horn lot because she "needed the money."  Proceeds from the sale of the Big Horn Lot were deposited into Debtor's checking account on June 21, 2007.

After entering into Mini Settlement One, Debtor financed her overhead with proceeds from the sale of the Big Horn Lot and smaller loans she obtained from people with whom she

---

[13]  According to Debtor, the values assigned to all community property were based upon Blixseth's estimates of value from 2006.  Debtor learned much later that the values Blixseth had assigned to assets were greatly overstated.

had prior banking relationships.  The evidence shows that as of June 14, 2007, Debtor had a

negative balance of $301,610.50 in a checking account at Palm Desert National Bank.  The

negative balance continued until June 21, 2007, when Debtor received proceeds of $2,439,417.16

from the sale of the Big Horn Lot.  Debtor testified that "past-due bills were somewhat paid"

with the proceeds from the sale of the Big Horn Lot.  However, by July 18, 2007, the balance in

Debtor's checking account had dipped below zero once again.

As another stopgap measure, Debtor, through Monarch Investments, LLC, secured a loan

from Stockman Bank using Monarch Investment, LLC's commercial building in Bozeman,

Montana as collateral.  Per a promissory note dated July 20, 2007, Stockman Bank loaned

Monarch Investments, LLC $2,004,112.  Debtor again borrowed $202,000 from Stockman Bank

on or about August 14, 2007.  The August 2007 loan was secured by Lot 48.

When asked to describe her financial condition as of June 15, 2007, Debtor said: "I don't

know how to even describe it.  It was, it was still with the hopes that everything was going to

come together more quickly than it did, and but it was just trying to – trying to pay $100 worth of

stuff with 10 cents.  I mean that's – it, it was tough."  In an affidavit dated July 27, 2007, and

filed with the Superior Court of California, Debtor declared under penalty of perjury that she was

"in arrears to creditors in the approximate amount of two million dollars, even after using all of

the proceeds from the sale of my real estate parcel.  These debts are primarily due to the ordinary

expenses of Porcupine Creek, and they are increasing by hundreds of thousands of dollars per

month."

Debtor's cash situation was further frustrated when on July 1, 2007, Blixseth quit paying

Debtor her salary of $33,000 per month from the Yellowstone Club.[14]  Between July 31, 2007, and September 7, 2007, Debtor's checking account was only positive when Debtor was able to obtain $320,000.00 in additional funds from Stockman Bank.  Debtor was also negotiating with Blixseth to receive additional cash from the marital estate.  On September 7, 2007, Debtor signed a Second Stipulation and Order for Partial Division of Property, Pendente Lite Payment of Expenditures and Miscellaneous Issues ("Second Mini Settlement"), which was approved by the Superior Court of California on September 20, 2007.  As part of the Second Mini Settlement, Debtor received $1 million from Blixseth on September 7, 2007, and received another $1 million from Blixseth on September 14, 2007.  The $2 million kept the balance positive in Debtor's checking account until October 22, 2007, when the balance fell to a negative $14,250.68.

As part of the Second Mini Settlement, Debtor was to receive: (1) Porcupine Creek, along with the three houses and condominium located outside the gates of Porcupine Creek that were used in connection with Porcupine Creek's maintenance and operation; (2) Debtor and Blixseth's combined 60% interest in Blixseth Family Investments, LLC ('BFI'); and (3 ) Debtor's start-up technology companies, xPatterns, LLC and Opspring, LLC.  In turn, Blixseth was to receive the entire community interest in Western Pacific Timber, the Desert Ranch Properties, the BGI Office on Sahara Road, the Johnson Big Horn condominium, the wine stored at Porcupine Creek, a house in Tennessee, the LaPaz Properties, the Turks and Caicos property, the boats known as Piano Bar, Tooth Fairy and Piano Bar II, and a ranch in Cody, Wyoming.  Because the assets Debtor was receiving were not income producing, and because Blixseth "was in control of 100

---

[14]  It appears Blixseth quit paying Debtor her salary of $8,000 per month from BGI shortly after October 31, 2007.

percent of the community cash flow," Blixseth was supposed to pay all the "expenses for the operation, use and maintenance of the Porcupine Creek property." Notwithstanding, Debtor testified that "[t]here were a few [expenses] paid by Tim, and that stopped very quickly" after Blixseth and Debtor entered into the Second Mini Settlement.

In January 2008, Debtor filed an Income and Expense Declaration in the Superior Court of California representing that her monthly expenses at that time were $2,181,351, which amount included financing expenses of $70,055 per month associated with the approximately $10,316,692 she had borrowed since December of 2006 to cover her expenses.[15] Debtor listed monthly income of $22,667.

By April 18, 2008, when Debtor signed a Declaration in Support of Petitioner's Ex Parte Application for Orders Relating to the Maintenance and Payment of Existing Insurance Policies, Debtor had "no current income," and "owe[d] approximately $23 million to lenders (for monies borrowed to sustain my businesses, residences and lifestyle) and to the taxing authorities (for one-half of the 2006 community tax liability and interest thereon)." Debtor argued in the Declaration that Blixseth "control[led] 100% of the community's cash flow." Debtor echoed the foregoing in another Declaration signed May 30, 2008, in which Debtor declared, in part:

> 4.     Below is a summary of my current financial circumstances.
>
>     a.    I receive no money and no financial support from Tim.

---

[15] The $10,316,692 pertains to loans Debtor secured from Palm Desert National Bank, Stockman Bank of Montana, American Bank of Montana and First Bank. In a personal financial statement dated October 13, 2007, Debtor listed her debts to the foregoing lenders at $10,444,298. By May 16, 2008, Debtor's personal debts had increased to $24,512,950 and as of November 15, 2008, her personal debt, including "other liabilities," had increased to $95,744,479, which amount included an obligation of $35,400,000 that Debtor borrowed from CIP Yellowstone Lending, LLC to finalize the MSA.

b.    Tim controls 100% of the community's cash-flow and income.  Tim does not pay any of my expenses (other than a portion of my insurance, which Tim has threatened to cancel, and which is the subject of an upcoming hearing).

c.    I have approximately $2.2 million in monthly expenses, primarily associated with operating the properties and assets awarded to me by two mini-settlements.  Porcupine Creek alone costs approximately $750,000 per month to operate, consistent with the operating cost of Porcupine Creek during marriage.

d.    I have borrowed more than $20 million since separation in order to pay my expenses.

e.    I have no income with which to repay my debt.  I used to receive a monthly salary from Yellowstone Club and payments from BGI, but Tim caused these to stop in 2007.  I work more than eighty hours per week without pay for my start-up software companies, Opspring and Blxware[16], which have not yet generated any revenue or income.  Earlier this year, I received a one-time distribution from Blixseth Family Investments, LLC of $2.91 million, which I used to cover operating expenses, payroll and other expenses.  The distribution was the result of an annual payment on a promissory note held by BFI and there will not be another payment until 2009.

f.    The Internal Revenue Service (IRS) is threatening to levy against my property.  I still owe **$3,177,921** in 2006 community income tax liability to the federal and state taxing authorities (for income that primarily was received by Tim and not by me.)  I received a notice dated May 5, 2008 from the IRS informing me that the IRS will levy against my property if the taxes are not paid. . . .

[g].    The California Franchise Tax Board (FTB) has threatened to file a lien against my property because I have not paid the outstanding 2006 community income tax liability (again, income that primarily was received by Tim and not be me.) . . .

h.    My total combined bank balances are **less than zero.**

i.    At this time, I have **$8,154,007.05** in outstanding bills and invoices that I owe to various vendors, many of which are past due. . .  There are

---

[16]  Blxware was another technology-related company that Debtor started sometime after she and Blixseth entered into the Second Mini Settlement in September of 2007.

far too many such notices and invoices for me to submit with this ex parte application, so I am providing only a small sample.  They include, among others:

> i.   A service disconnection notice from Southern California Edison, which states that the past-due amount **must be paid by June 2, 2008 at 5 p.m.** (which I anticipate to be the date of the hearing on this ex parte application) **or the electricity will be disconnected**.

> ii.   A cancellation notice from Chubb Insurance, notifying me that the home and vehicle insurance on Lot 48 (title to which has not been transferred to me) is going to be cancelled for nonpayment.

> iii.   A bill from DirectTV.  (I cancelled this service to cut costs, but there is still a past-due balance owing).

> iv.   Past due grocery bills from food vendors, such as Bristol Farms and American Fish and Seafood.

> v.   A delinquency notice from the Coachella Valley Water District.

> j.   My immediate cash requirement to cover payroll for the ninety-seven people who work for me and my companies is $304,376.77.  This includes past due payroll from April, 2008.

> k.   My financial situation has gotten so bad that some of my employees and family members have lent me money.  The golf course superintendent at Porcupine Creek, Michael J. Raubolt, lent me $27,500.  Jory Russell, who handles my finances, lent me $40,000.  Nickolas Rhodes, a Blxware employee, lent me $150,000.  My son-in-law has lent me $380,000.  Aside from my bank loans, I need to repay these people as well.

> l.   I owe more than $1.25 million to my family law attorneys and forensic accountants in this matter.

Samson's Exhibit 47.  (Emphasis in original).

While attempting to obtain additional funds from Wachovia and in a continuing effort to

deal with her dire financial situation, Debtor was shocked to learn for the first time in June of

2008 that WCP had filed a UCC financing statement that encumbered "everything [Debtor]

25

owned, including [her] kitchen sink." Until June of 2008, Debtor was under the impression that she owned her personal assets free and clear of any liens. At that time, Debtor could not pledge Porcupine Creek as collateral because it was still owned by BGI, and BGI was under the sole control of Blixseth. Thus, Debtor offered to pledge her ownership in her new technology company, Blxware, as collateral for a loan from Wachovia. Upon learning of WCP's security interest from Wachovia, Debtor asked WCP to release its security interest in Blxware. After going back and forth, WCP agreed in June of 2008 to release its security interest in Blxware in exchange for a security interest in the Bellevue condominium. According to WCP's counsel, Debtor "took the Blxware interest from Western Capital's security interest, pledged it to Wachovia, and took $3 million, and she gave Western Capital substitute collateral that was worth roughly $2 million."

Debtor and Blixseth finally entered into a Marital Settlement Agreement on June 26, 2008. The Marital Settlement Agreement consists of 42 pages plus exhibits. The Marital Settlement Agreement was amended by an Amendment to Marital Settlement Agreement dated July 2, 2008, consisting of 4 pages, and was again amended by a Second Amendment to Marital Settlement Agreement dated August 12, 2008, consisting of 7 pages plus exhibits and certain side letters. The Marital Settlement Agreement and the amendments are collectively referred to as the MSA. Property was transferred pursuant to the MSA in August of 2008.

The MSA confirmed the division of property set forth in the Mini Settlements and divided additional assets and liabilities. Under the MSA, Debtor received the Yellowstone Club (which consisted of the four separate Yellowstone Club entities), BGI (the parent company of the Yellowstone Club entities), and Yellowstone Club World, LLC. Debtor immediately changed

the name of BGI to BLX Group, Inc. ("BLX").  On October 7, 2008, Debtor's marriage to

Blixseth was dissolved by a Judgment of Dissolution.

To finalize the MSA, Debtor secured, on or about August 13, 2008, a 30 to 45-day $35

million loan from CIP Yellowstone Lending, LLC.  The CIP Loan was evidenced by two

notes:

> 1.  A Promissory Note in the principal sum of $13,000,000.00 made by BLX and
> Debtor to CIP; and
>
> 2.  A Promissory Note in the principal sum of $22,000,000.00 made by BLX and
> Debtor to CIP.

The CIP Loan was secured in part by a Deed of Trust, Assignment of Leases and Rents, Security

Agreement and Fixture Filing (the "CIP Deed of Trust") granted by the Debtor and BLX which

encumbered both Porcupine Creek and the 160-acre family compound at the Yellowstone Club.

Of the $35 million loan, CIP paid: $13,094,973.33 to CrossHarbor Capital Partners, LLC for an

obligation Blixseth owed to CrossHarbor on a home in Washington; $8 million to the LeMond

Plaintiffs as part of Blixseth's settlement of the LeMond Litigation; and $4,944,396.17 was wired

directly to Blixseth.  Only $1,016,477.28 of the $35 million loan proceeds were paid to Debtor.

**VIII.   Post MSA**

After the MSA, Stockman Bank granted Debtor a $4,625,670.25 loan on September 8,

2008, and a $146,748.00 loan on November 6, 2008.  Debtor also borrowed money from Peter

Brubeck on September 4, 2008, and other various individuals in September 2008.  Debtor also

borrowed money from Suter Financial Group, Inc. in October 2008.

When Debtor's access to cash finally dried up, she caused Yellowstone Mountain Club,

LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction

Company, LLC to file Chapter 11 bankruptcy petitions on November 10, 2008.

On December 12, 2008, WCP filed a complaint against Debtor and Crocker in the United States District Court for the District of Colorado.[17]  After Debtor and Crocker failed to respond to the complaint, default judgment in the amount of $13,298,628.18 was entered in favor of WCP and against Crocker and Debtor on January 23, 2009.  On January 23, 2009, just two days after WCP secured its default judgment, four of the individuals who had bought memberships in Yellowstone Club World, LLC filed an involuntary Chapter 7 bankruptcy petition against Yellowstone Club World, LLC.  WCP levied Debtor's Wells Fargo checking account on February 12, 2009, seizing $45,200.63.

On February 13, 2009, Crocker filed his own voluntary Chapter 7 bankruptcy petition and not long thereafter, Debtor filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009. By that time, Debtor's secured debt totaled $102,099,281.08, and her unsecured debt totaled $56,995,470.21.  In her schedules, Debtor valued Lot 48 at $7.1 million, and valued Lots 6 and 7 of Cougar Park at $2.1 million.  The Internal Revenue Serviced filed Amended Proof of Claim No. 16 on December 21, 2012, claiming Debtor owed taxes, not including interest, of $20,258,609.32 for the tax period December 31, 2005.  The Montana Department of Revenue similarly filed Amended Proof of Claim No. 18 on September 17, 2009, claiming Debtor owed, for taxes, penalties and interest for 2002, 2003, 2004, 2005 and 2006, the sum of $53,895,198.00.

Debtor's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Samson was appointed the Chapter 7 Trustee on that same date.  Samson described the first six

---

[17]  WCP did not name Montana Specs, LLC, Monarch GoBuild Construction, LLC, Gobuild, Inc., or Blue Sky Development, LLC as defendants in the Colorado action.

or eight months following his appointment as the Trustee in this case as chaotic, at best.

On June 5, 2009, Samson, in his capacity as Trustee of Debtor's bankruptcy estate, caused a voluntary Chapter 7 bankruptcy petition to be filed on behalf of Big Springs Realty, LLC.  An involuntary Chapter 11 bankruptcy petition was filed against BLX on September 21, 2009.

WCP filed Proof of Claim No. 60 in Debtor's bankruptcy case on August 7, 2009, asserting a $13,965,144.17 secured claim against Debtor, with an annual interest rate of 15 percent.  WCP filed an adversary proceeding against Debtor on November 30, 2009, seeking to except its debt from Debtor's discharge under 11 U.S.C. § 523(a)(2)(B).  *See* Adversary Proceeding No. 09-00100.  WCP filed a motion for summary judgment in that action on August 20, 2010, arguing that had "WCP known that the Debtor was not able to pay her debts as they became due and was insolvent, then WCP would not have extended the 13 Million Loan."

As of May 30, 2009, Debtor owed Stockman Bank $7,285,252.12.  Pursuant to a stipulation filed August 25, 2009, the Court entered an Order in Debtor's main bankruptcy case on September 11, 2009, granting Stockman Bank relief from the stay as to Lots 6 and 7, of Cougar Park.  That same Order granted Samson 180 days from August 24, 2009, to try and sell Lot 48, after which time, if Stockman Bank had not been paid in full, it was granted leave to pursue its nonbankruptcy remedies against Lot 48.  Debtor assigned any right of redemption she had in Lots 6 and 7 of Cougar Park and Lot 48 to Stockman Bank in exchange for $10,000, which amount was paid to the Trustee.  The only value Debtor's bankruptcy estate received from Lots 6 and 7 and Lot 48 was a $10,000 payment for assignment of any right of redemption.

Casa Captiva was, at all relevant times, owned by BLX.  Casa Captiva was eventually

administered in BLX's bankruptcy case.  Samson referred to Casa Captiva as a liability because

he spent a lot of time and money responding to a lawsuit that was filed in connection with Casa

Captiva.  Samson was not aware that Blixseth had once valued Casa Captiva at $15 million, but

did recall that Blixseth may have had Casa Captiva listed for sale at a price of $22.5 million.

Samson eventually abandoned any interest Debtor might have had in Casa Captiva.

  When questioned about the G-IIb aircraft awarded to Debtor in Mini Settlement One,

Samson testified that he believed the airplane was leased, and the airplane no longer existed by

the time Debtor filed her bankruptcy petition in March of 2009.[18]  Counsel for WCP also

questioned Samson about the value of the 160 acre family compound at the Yellowstone Club,

which according to Mini Settlement One, was awarded to Blixseth.  It was not until Debtor and

Blixseth finalized the MSA that Debtor was ultimately awarded the 160 acre family compound.

CIP Yellowstone Lending, LLC made a stalking horse bid of $10,850,000 for the family

compound, which included a cash component of $850,000.  No competing bids were submitted,

and the Court approved the sale of the family compound to CIP Yellowstone Lending, LLC on

May 25, 2011.

  Samson abandoned Debtor's interest in Monarch Investments, LLC.  On October 23,

2009, Samson filed an amended motion to sell Debtor's "Bellevue Condo" for $1,850,000.00.

Samson's aforementioned amended motion, which was granted November 5, 2009, specifically

provided that "nothing in th[e] motion [wa]s intended to constitute a waiver or relinquishment of

any claims which Trustee may assert against Western Capital Partners, pursuant to 11 U.S.C. §§

---

[18] Debtor testified the airplane was grounded when Blixseth quit paying the costs
associated with operating the airplane.

544 or 548." WCP granted Debtor's bankruptcy estate a carve out of $40,000 from the sale of the Bellevue condominium.

In Crocker's bankruptcy case, the Court entered an Order on July 27, 2011, retroactively modifying the stay so American Bank could pursue its nonbankruptcy remedies against Story Mill. American Bank foreclosed its lien against Story Mill, thereby rendering WCP's second position lien against the Story Mill project valueless.

Samson's counsel sent a demand letter to WCP on March 27, 2011, claiming that the interest charged by WCP was usurious. In a response dated March 23, 2011, WCP requested a detailed explanation of Samson's mathematical assumptions.

### IX.    Expert Opinions

### a.    Joseph N. Karas ("Karas")

WCP stipulated that Karas is a solvency expert. Karas is a certified public accountant who has worked for Moss Adams since 1979. Karas is currently the managing audit partner of Moss Adams' Portland, Oregon office. Throughout his career, Karas has spent a lot of time working in the forest products industry. In fact, Karas served as the forest products industry chairman for Moss Adams for over 25 years. Karas has also worked on several major bankruptcies during his career and was assisted in several Chapter 11 bankruptcy restructurings. Karas testified that his knowledge of the forest products industry, including knowledge obtained from periodicals he has been receiving since the early 1980s on lumber prices and their impact on housing starts and construction, helped him in this case. Karas explained that such information was helpful "in determining future cash flows for entities, cash flow being a major determinant of solvency as well as going-concern values as well as Chapter 11 restructurings."

31

Karas explained that as audit partner, he is required to give opinions on financial statements.  Karas testified that many of the opinions he issues include a going-concern standard which includes "look[ing] at future cash flows and you discount those back to using present-value calculations to determine whether the entity will have sufficient cash flow in which to meet its scheduled debt payments."  In discussing the concept of valuing an entity on a going-concern basis, Karas testified:

> [T]he accounting professionals moved over the years to look at discounted cash flows as the way to value assets for purposes of going-concern calculations.
>
> * * *
>
> It became apparent that, with regard to going concern, future cash flows are the most important determinant as to your ability to repay debts and to meet scheduled obligations, in addition to when you look at schedules of cash flows versus pure balance-sheet testing, balance sheets have assets on them that may not turn into future cash flows, intangible assets being one.
>
> Also, balance sheets sometimes do not consider the state of certain assets. So if you're running a development operation, you might be halfway done with that development and you might have a big investment in it, but you may not have the capital to finish the development; so therefore, future cash flows from that development would be required to complete the development.
>
> So as a result, the accounting standards have become more precise over the years to dictate that future cash flows are the way to value assets for purposes of going-concern analysis.

In describing the difference between a going-concern value and an appraised value, Karas explained that accountants are always looking forward, and appraisers are generally looking backwards:

> A lot of times, appraisers tend to use what they might consider comparable sales or other information that's historical in nature and tends not to consider future cashflows. And as a result, when they don't consider future cash flows, they're not really dealing with current market conditions.

* * *

. . . all the literature in the accounting profession dealing with solvency as well as going concerns as well as Chapter 11 restructurings are always looking forward to what the future cash flows of the organization are.

* * *

Historical cash flow is somewhat important to give you an indication as to what the, what the future cash flows of the organization are. But when you're looking at being able to meet scheduled debt payments as well as scheduled commitments that you have, future cash flow is what you'll pay those debts with.

Because of events that happened in the 1980s and 1990s, solvency opinions became more complicated and more expensive.  In an effort to be more competitive, accountants devised alternatives -- such as adding disclaimers to their solvency opinions,- -- to reduce the expense associated with a complete solvency analysis.  Karas explained that his firm is now routinely hired to do due diligence to determine the future cash flows of an organization, and to ascertain whether there is adequate cash flow to deal with the uncertainties of the marketplace, prior to any lending activity.

Karas, like other solvency experts that have testified before this Court, identified the three solvency tests:

1.    The Cash Flow Test.  Karas explained that this test examines whether an "entity has an ability to pay going forward, and it's probably the dominant test that people use to determine solvency."

2.    The Adequate Capital Test.  Karas referred to this test as a secondary test that is somewhat related to the Cash Flow Test in that the Adequate Capital Test looks at whether an entity has adequate capital to maintain its cash flows.

33

3.      The Balance Sheet Test.  Karas testified that this test is not merely a point-in-time

test that subtracts liabilities from assets because assets should be valued at the net

present value of their future cash flows.

According to Karas, all three tests are related in that the end question is whether a company has

the ability to repay its debts at any point in time.  Karas agreed that it could be possible for an

entity to be solvent from a balance-sheet standpoint and insolvent under the other tests,

particularly if an entity had insufficient capital going forward to meet the risks of the

marketplace.

Counsel for Samson contacted Karas to determine whether Debtor was solvent on June

15, 2007.  Karas testified that Samson's counsel provided him with a lot of documentation, and

while he did not read it all, he probably reviewed nearly 1,000 pages of documentation.  Karas

found four or five documents particularly relevant to his analysis.  Karas started with Debtor's

bankruptcy schedules to see what level of income Debtor was reporting at that time.  In March of

2009, Karas noted that Debtor had zero operating cash flow and according to the values asserted

by Debtor, her liabilities exceeded her assets by approximately $60 million.  Karas explained that

when completing audits, accountants routinely utilize the "subsequent events review"

methodology, which requires looking at events through the date of the report in order to form a

solvency opinion.

Karas also reviewed extensively a report prepared by Kent Mordy in connection with the

Yellowstone Club bankruptcies.[19]  Karas explained that Kent Mordy's report was instructive

---

[19]  Kent Mordy testified as an expert in Adversary Proceeding 09-00014.  Based upon
Mordy's testimony in that Adversary Proceeding, this Court concluded that the Yellowstone
Club's earnings before interest, taxes, depreciation and amortization ("EBITDA") was a negative

because Kent Mordy had the opportunity to thoroughly review and analyze the cash flows of the

Yellowstone Club entities, BLX and Debtor.

Karas also reviewed certain affidavits and declarations Debtor signed in connection with

her divorce proceeding, which were particularly relevant because they confirmed what Karas

believed was happening on June 15, 2007. Karas also analyzed debtor's general ledger account

activity to corroborate Debtor's declarations and Karas looked at Jory Russell's deposition

transcript, and his explanation of how Debtor was managing her day-to-day cash flows in 2007.

Karas explained that the foregoing items supported Debtor's claim that her expenses were

roughly $2 million per month on June of 2007, and that she was borrowing money to pay her

day-to-day expenses.

Based upon his review, Karas concluded:

[T]here was never any operating cash flow in Edra Blixseth's hands at any point in time that I could find. In other words, I've looked for what assets would be generating cash from purely the day-to-day operations of, of the activities. The only one that you -- every, every asset that I've looked at - Blxware, all the other assets - were simply not generating cash. The only form of cash generation that could occur would be through the sale of that asset, and that would essentially reduce her committed obligations. But the sales of those assets would never allow her to meet her scheduled debt payments, so as a result, she was insolvent on a cash-flow basis from June throughout until March of 2009.

Karas concluded that Debtor had $21,516,000 of debt on June 15, 2007, and that amount

increased to $160 million (excluding the debts of the Yellowstone Club) by March of 2009.

---

$15,701,772 in 2002, a positive $20,369,766 in 2003, and a negative $45,910,598 in 2004. In 2005, the Yellowstone Club borrowed $375 million from Credit Suisse, leaving the Yellowstone Club with cash EBITDA of $17 million in 2005, $25 million in 2006, and $23 million in 2007. Mordy concluded that the $375 million Credit Suisse loan, and the personal use of $209 million of those proceeds by Blixseth, left the Yellowstone Club highly leveraged and with too little capital with which to fund its financial plans and projections.

Karas concluded Debtor's assets as of June 15, 2007, totaled only $16,470,848. The fact that Debtor had the ability to borrow additional funds did not, in Karas's opinion, substitute for operating cash flows. Karas explained that Debtor's negative cash flows were causing a continuing erosion of Debtor's asset base and as a result, there was "no basis for maintaining a going-forward opinion."

Karas also concluded that the when Debtor finally entered into the MSA in 2008, it "exacerbated" Debtor's cash flow issues,

> because the assets that she was getting were essentially requiring cash to maintain; so as a result, the pace of her deterioration and her, and her, essentially her equity -- well, there wasn't any equity. But in relation to her equity, it was just accelerated because she was taking on assets that required cash, and she didn't have any other source to generate cash to deal with those carrying costs other than borrowing money from other individuals or borrowing against assets that she already had.

Karas outlined his solvency conclusions in a May 2, 2011, letter to Samson. *See* Exhibit 69. Karas concluded that Debtor was "the very definition of insolvency," in that she had negative cash flows from June of 2007 all the way up to her bankruptcy. Karas concluded that Debtor failed all three solvency tests on June 15, 2007.

**b.    Raymond L. Dozier ("Dozier")**

Samson stipulated that Dozier was an expert with regard to appraisals of real estate. Dozier appraised Porcupine Creek several times.

The first time Dozier appraised Porcupine Creek was in connection with a loan Blixseth secured from Palm Desert National Bank. Dozier did another as-is market value of the fee simple interest on October 17, 2007. *See* WCP's Exhibit 70. Dozier explained that an as-is market value appraisal assumes an "an arm's length sale, a willing buyer and willing seller, each

36

equally knowledgeable of the market, each under no duress to buy or sell, the property is exposed

to the market for a reasonable length of time, and it's sold for cash or cash equivalent."  Based

upon the foregoing assumptions, Dozier concluded Porcupine Creek had a value of $207 million

on October 17, 2007, explaining "what that means is prior to that date, 8 to 10 months prior to

the date, the property was listed on the market, aggressively marketed, shown to many people,

and then it went into escrow and sold on that date. So it's, it means value and exchange. It's, it's

not what it's worth to the Blixseths, it's not what it's worth to a buyer; it's what it is just in the

marketplace."

Dozier testified that his opinion of value was not based upon the income approach

because when he did his appraisal, Porcupine Creek had no income-producing ability.[20]  Dozier

instead used the costs approach and the sales-comparison approach to complete his appraisal.

Dozier testified that his opinion of value would be impacted if the hypothetical seller was in

distress.

Dozier later appraised Porcupine Creek in 2009 for $128 million, explaining that "the

highest and best use of that land had changed from 'immediate development' to 'hold for future

development.'" Dozier again appraised Porcupine Creek in October of 2009.  Dozier's opinion of

value at that time had declined to $108,500,000.00, with a further diminution in value due to a

bankruptcy taint of $73,500,000.00.  Porcupine Creek eventually sold in March of 2011 to the

third richest man in the United States for $43 million.

Finally, WCP hired Dozier to perform a retrospective appraisal, giving his opinion of

---

[20]  Dozier did, however, consider discounted cash flows under the "land residual" or the
"developer's property method" when he was determining the highest and best use for the
property.

value as of June 15, 2007.  In a restricted appraisal, Dozier concluded the value of Porcupine

Creek on June 15, 2007, was $207,590,000.00.  *See* WCP's Exhibit 33.

     **c.**     **Kristina A. Cook ("Cook")**

     Cook, a certified public accountant, has been employed as a financial forensic consultant

with Patten, MacPhee & Associates since 2011.  Patten, MacPhee & Associates is a litigation

support firm.   Samson stipulated that Cook was an expert.

     Cook generally understood that she was hired by WCP to look at Karas's May 2, 2011,

letter to Samson and determine whether Debtor was solvent on June 15, 2007.  In examining

Karas's letter to Samson, Cook agreed with Karas's valuation of noncontingent assets and

liabilities.  However, Cook assumed, "as a matter of law," that Debtor owned one-half the

marital estate as of June 15, 2007.

     Based upon her assumptions, Cook made two sets of adjustments to Karas's conclusions.

First, Cook added assets that had been awarded to Debtor under Mini Settlement One.  Next,

Cook further adjusted the balance sheet to account for Debtor's "vested 50 percent interest in the

community property."  Cook's second analysis, which accounted for one-half of the community

property, was based upon a schedule of assets and debts submitted to the California Superior

Court by Blixseth on June 29, 2008.  In describing why, in Cook's opinion, title is not necessarily

indicative of ownership, Cook explained,

> if the individual had an ownership interest -- I guess what I'm saying is the title
> isn't really tied to the ownership in, in looking at these types of analyses for
> accounting purposes. You know, we're looking, you know, equitable interest or,
> you know, things that, that you lawyers figure out, but we're looking at the
> property that are assets of the person.

Based upon the foregoing assumptions, Cook concluded Debtor was solvent under the

Balance Sheet Test.  Cook also concluded Debtor was solvent under the Cash Flow and

Adequate Capital Tests.

Cook described the Cash Flow Test as "whether the debtor intended to incur or believed

that she would incur debts beyond her ability to repay."  Cook considered Debtor's testimony that

she intended to repay her debts as they matured "pretty good proof" that she did not intend to

incur or believed that she was incurring debts beyond her ability to repay.  Cook was also

convinced that Debtor was solvent under the Cash Flow Test "[b]ased on her spending habits,

based on the affidavit that she signed in connection with the extension of the loan, and based on

what I understand to be her testimony in this courtroom, I believe that she intended to pay all of

her creditors."

Cook explained that the Adequate Capital Test "examines whether or not the transaction

left the debtor with insufficient capital to continue normal business operations."  According to

Cook,

> there's three different ways that you can get capital: You can get it through
> operations, which is the cheapest way to get it, but that would be through selling
> inventory and conducting, you know, your normal operations; you can get it
> through borrowing, which is more expensive than getting it through operations,
> but that still provides capital, continuing operations; or you can get it through,
> through equity financing, which would be the most expensive way to get capital,
> but it is still an avenue for getting capital.

Debtor was, in Cook's opinion, solvent under the Adequate Capital Test because Debtor still had

the ability to borrow money to fund her day-to-day operations.  Neither Cook nor Karas

considered the taxes Debtor owed to the Internal Revenue Service or the Montana Department of

Revenue.

Karas claims Cook did not perform a proper analysis of Debtor's solvency under any of

the three solvency tests.  Karas first contends Cook simply considered one-half the community estate, based on values assigned to assets by Blixseth, and subtracted certain of Debtor's liabilities.  On a balance-sheet basis, Cook concluded Debtor was solvent on June 15, 2007, based upon Cook's finding that Debtor's assets were worth roughly $377 million on June 15, 2007, and that the value of Debtor's assets exceeded her liabilities by roughly $173 million. Cook believed Debtor's personal liabilities were approximately $8.5 million on June 15, 2007, while her personal assets, excluding community property, totaled approximately $47 million.

Cook criticized Karas for failing to use professional skepticism when examining documents, such as declarations, that were prepared after June 15, 2007.  Cook explained that such documents were "filed not specifically for the purpose of documenting historical circumstances[,]" but rather, were "filed with the Court for the purpose of eliciting a result." Interestingly, Cook applied no professional skepticism to values assigned to marital assets by Blixseth in his June 2007 declaration.  Karas, on the other hand, tested the veracity of the documents and declarations he examined.

Cook also criticized Karas for considering the full amount of Debtor's guarantee of the WCP loan as liability of Debtor.  Cook explained:

> The valuation of the contingent liability needs to account for several different factors, including the value of the primary security, the probability that the primary borrower -- borrowers would default on the loan, the possibility that -- or the probability that the other guarantor, Matthew Crocker, would not satisfy the remainder of the, of the loan. And so there were a lot of factors that needed to be weighed in order to get to a valuation, and Mr. Karas didn't consider any of those factors.

### CONTENTIONS OF THE PARTIES

Samson argues Debtor's guarantee of Crocker's loan with WCP is avoidable under

40

Montana and federal fraudulent transfer law. Samson contends that on June 15, 2007, when Debtor guaranteed the WCP loan for Crocker, that Debtor was insolvent, was engaged in businesses and transactions for which her remaining property was unreasonably small and that she had incurred debts that were beyond her ability to repay as they matured. Samson argues community property should not be considered in determining whether Debtor was solvent on June 15, 2007. WCP counters that Debtor received reasonably equivalent value when she signed the loan guarantee and that Debtor was solvent on June 15, 2007. In arguing that Debtor was solvent, WCP contends community property should factor into the solvency analysis and that the liability stemming from Debtor's guaranty and security agreement should not be valued at the full amount of the loan.

Samson also alleges that WCP received a $45,200.63 preferential transfer when it garnished Debtor's checking account on or about February 12, 2009. Next, Samson alleges WCP charged a usurious rate of interest. In response to Samson's usury claim, WCP asserts that it did not intend to charge more than the legally allowable rate of interest and that Debtor did not pay all the interest payments asserted by Samson.

Finally, the Trustee requests that WCP's Proof of Claim No. 60-1 be disallowed. WCP has no specific response to this claim, which is a claim in the alternative.

In the parties' "Final Pre-Trial Order" filed May 30, 2012, WCP asserted the following affirmative defenses: (1) Failure to state a claim upon which relief can be granted; (2) Lack of substantial justification for the Complaint; (3) Trustee lacks standing; (4) Estoppel, waiver, release, and laches; (5) Claims are barred by the applicable statutes of limitations; (6) Failure to join necessary and indispensable parties; (7) Lack of subject matter jurisdiction; and (8) Good

faith lender (usury).  WCP also generally asserted a defense of *res judicata*.  The above defenses were not addressed in WCP's Post-Trial Memorandum.  The Court deems such defenses waived.

## APPLICABLE LAW and DISCUSSION

As a preliminary matter, the Court tentatively ruled that it would admit Jory Russell's Rule 2004 examination transcript into evidence.  The Court adopts its tentative ruling as a final ruling.

Citing *Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 370 (Bankr. E.D. Tenn.2009), WCP argues that under Rule 32, FED.R.CIV.P., the Rule 2004 examination transcript of Jory Russell, taken by WCP in Debtor's main bankruptcy case, is hearsay and not admissible in this adversary proceeding.  Samson counters that Russell's Rule 2004 examination transcripts are admissible under Rule 32(a)(4), FED.R.CIV.P., and Rule 804, FED.R.EVID.

In *Oliver*, the bankruptcy court for the Eastern District of Tennessee summarily concluded:

> In an adversary proceeding, discovery is governed by Rules 26 through 37 of the Federal Rules of Civil Procedure, incorporated into Rules 7026 through 7037 of the Federal Rules of Bankruptcy Procedure.  More specifically, oral testimony is taken by deposition pursuant to Rule 30 of the Federal Rules of Civil Procedure and its admissibility is governed by Rule 32.  Because a Rule 2004 examination is not a deposition, Mr. Householder's testimony will not be admitted into evidence for purposes of the Motion for Summary Judgment.  Accordingly, no portion of that Rule 2004 transcript will be considered.  *See In re Enron Corp.*, 281 B.R. 836, 840–42 (Bankr. S.D.N.Y. 2002) (Contrasting the "broad and unfettered ... fishing expeditions" allowed under Bankruptcy Rule 2004 with the discovery procedure allowed under the Federal Rules of Civil Procedure once an adversary proceeding or contested matter is commenced).

*Oliver*, 414 B.R. at 371.  The Court finds *Oliver* distinguishable from this case.

The court in *Oliver* citing *In re Enron Corp.*, summarily concludes that "a Rule 2004

examination is not a deposition," and thus, because Rule 32 only references "depositions," it necessarily does not apply to Rule 2004 examinations   This Court does not read *Enron* – which involved a party's attempt to use a Rule 2004 examination as a tool to circumvent the Federal Rules of Civil Procedure -- so narrowly.

WCP filed a motion in Debtor's main bankruptcy case on May 13, 2009, seeking to examine Russell pursuant to Rule 2004.  The Court granted WCP's motion, and the examination took place in California, prior to the commencement of this Adversary Proceeding.  At the time of trial, the parties agreed that Russell lived in Idaho Falls, Idaho, which is more than 100 miles from Butte.  In addition, Russell was served with a subpoena and responded in no uncertain terms that he would not answer any questions and would "plead the Fifth."  None of the concerns addressed in *Enron* are present here.

Accordingly, given Russell's refusal to testify, this Court concludes that Russell's Rule 2004 examination transcripts are admissible.  *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 964-65 (6th Cir.1993) (testimony taken in a Rule 2004 examination was admissible at trial after the witness declined to testify on Fifth Amendment grounds); and *In re Avon Townhomes Venture*, 433 B.R. 269, 280 n.13 (Bankr. N.D.Cal. 2010) (finding that testimony taken in a Rule 2004 examination was admissible over a hearsay objection pursuant to Fed.R.Evid. 804(b) since the witness was unavailable due to the witness invoking the Fifth Amendment).

1.    **Counts One and Two: Fraudulent Transfers (11 U.S.C. §§ 548 and 550, and Montana law)**

"Federal bankruptcy law, like state fraudulent transfer laws, generally allows a creditor to ask the court to void certain transfers if the creditor can establish either actual fraud or

constructive fraud. An actual fraud theory alleges that the debtor transferred assets within a specified period before filing for bankruptcy and that the debtor did so with a fraudulent intent. Constructive fraud proceeds on the theory that, although the debtor may not have had a fraudulent intent, the court nevertheless should void the transfer, usually because the debtor received inadequate consideration." *In re Bledsoe*, 569 F.3d 1106, 1109 (9th Cir. 2009). Samson seeks to avoid Debtor's guarantee of WCP's $13,065,000.00 loan to Montana Specs, LLC, Monarch GoBuild Construction, LLC, Gobuild, Inc., and Blue Sky Development, LLC as constructively fraudulent based upon 11 U.S.C. § 548(a)(1)(B).[21] Section 548(a)(1)(B) provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or]
> >
> > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital[.]

*See also, In re Feiler*, 218 F.3d 948, 952 (9th Cir. 2000).

Samson seeks recovery from WCP based upon 11 U.S.C. § 550. Section 550 provides that "to the extent a transfer is avoided under section . . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value

---

[21] Section 548(a)(1)(A) and (B) were formerly designated as 548(a)(1) and (2) before amendment by the Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105-183.

of such property, from — (1) the initial transferee of such transfer or the entity for whose benefit

such transfer was made . . . ."  The Ninth Circuit explains § 550 as follows:

> Once a transfer has been avoided under a section such as § 545, § 550 authorizes
> the trustee to recover the property to the extent that the transfer is avoided.  *See* 5
> Myron M. Sheinfeld et al., *Collier on Bankruptcy* ¶ 550.02 & n. 1 (Lawrence P.
> King ed., 15th ed.1999); *see also Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34
> F.3d 800, 809 (9th Cir.1994) ("[S]ection 550 specifies the conditions under
> which, once a transfer is avoided under section 544 or other provisions, a trustee
> can recover from various transferees.") (quoting *Lippi v. City Bank*, 955 F.2d 599,
> 605 (9th Cir.1992) (alteration in original)).  Section 550, therefore, merely enables
> a trustee to recover property after a transfer has been avoided under any of the
> sections dealing with the trustee's avoiding powers. *See* Sheinfeld, *supra*, at ¶
> 550.01[1] ("Section 550 permits a trustee (or debtor in possession), after
> avoidance of a transfer under the trustee's avoiding powers, to recover the
> property transferred or the value of the property transferred.") (footnote omitted);
> *see also* H.R.Rep. No. 95-595, at 375 (1978), reprinted in 1978 U.S.C.C.A.N.
> 5963, 6331 . . . .

*In re America West Airlines, Inc.*, 217 F.3d 1161, 1166 (9th Cir. 2000).  "Benefit to the estate" is

construed broadly under § 550(a).  *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800,

811 (9th Cir.1994).

In order to avoid Debtor's guarantee under 11 U.S.C. § 548(a)(1)(B), Samson must show

(1) that Debtor incurred an obligation; (2) within two years of her bankruptcy petition date; (3)

that Debtor received less than reasonably equivalent value for the obligation incurred; and either

(4) was insolvent at the time the obligation was incurred or was rendered insolvent as a result of

the obligation, or was engaged in business or a transaction, or was about to engage in business or

a transaction, for which any property remaining with the debtor was an unreasonably small

capital.  11 U.S.C. § 548(a)(1)(B)[22]; *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct.

---

[22]  Montana's fraudulent transfer law is substantially similar to § 548(a)(1) and thus, the
Court's analysis would be the same under Montana law.

45

1757, 1760, 128 L.Ed.2d 556 (1994); *In re Fritz*, 225 B.R. 218, 224 (E.D. Wash. 1997); *Hussey v. Haider (In re Haider)*, 126 B.R. 796, 798 (Bankr. D.Mont.1991).  WCP does not dispute that Debtor signed the guarantee on June 15, 2007, which was less than two years before Debtor's March 26, 2009, bankruptcy petition date.  Thus, the dispute between Samson and WCP centers around the third and fourth factors -- whether Debtor was insolvent or was rendered insolvent as a result of the transfer, and whether the transfer was for less than reasonably equivalent value.

      **a.**    **Reasonably Equivalent Value**

The language of § 548 clearly states that "the debtor" must receive "reasonably equivalent value in exchange for" the transfer or obligation.  11 U.S.C. § 548(a)(1)(B)(i).  While the term "reasonably equivalent value" is not defined in the Bankruptcy Code, for purposes of § 548, the term "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A).  Because the term "reasonably equivalent value" is not defined, 5 COLLIER ON BANKRUPTCY, ¶ 548.05[2][a] explains that "courts have divided the [reasonably equivalent value] inquiry into two parts.  First, the court must determine whether the debtor received *any* 'value' in the transaction.  Second, the court must determine whether the value received was 'reasonably equivalent' to what the debtor transferred." (Emphasis in original).

That language of § 548 means that a benefit is cognizable only if three requirements are satisfied.  First, the benefit must be received, even if indirectly, by the debtor, and the touchstone of a cognizable benefit is whether "'the debtor's net worth has been preserved.' and the interests of the creditors will not have been injured by the transfer."  *General Elec. Credit Corp. v.*

*Murphy (in re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (quoting *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2nd Cir. 1981)).  Second, any purported benefits must also be limited to cognizable "value."  Section 548 does not refer to "benefits" whether direct or indirect.  It requires "reasonably equivalent value" and includes a precise definition of "value" that encompasses only "property" and "satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. §§ 548(a)(1)(B)(I) and (d)(2)(A).  Since this case does not concern the satisfaction of debt, "property" received by the Debtor is the only value relevant here.  Third, property must have been received by the debtor "in exchange for" the transfers or obligation.

The Ninth Circuit Court of Appeals in *In re Prejean*, 994 F.2d 706, 708 (9th Cir. 1993), discussed the phrase "reasonably equivalent value" in the context of the California Fraudulent Transfer Act and concluded that reasonably equivalent value must be determined from the creditors' standpoint, not from the debtor's.  That remains the proper view under both Ninth Circuit and California fraudulent transfer law.  *See In re Bay Plastics, Inc.*, 187 B.R. 315, 329 (Bankr. C.D. Cal. 1995) (citing cases).

WCP argues in the first instance that Debtor did not need to receive reasonably equivalent value for the full amount of the $13,065,000.00 loan because the loan was adequately secured by Lot 176, Lot 178 and Story Mill.  Bailey and Adam's testimony indicates the contrary.

Adams testified that WCP was "relying on getting paid back through [Debtor]'s divorce settlement and the homes that we took the direct collateral."  The security interest in Story Mill was done in an "abundance of caution."  Consistent with Adam's testimony, Bailey testified that Debtor's guarantee was a "key component" to the loan and as a consequence, Bailey personally traveled to Bozeman to meet with Debtor because he "wanted to look her in the eye and have her

47

tell [him] that she was going to pay us back as a guarantor[.]" Conversely, Crocker's financial

position gave WCP pause for concern because Crocker's assets, which included Story Mill and

two homes, were illiquid and high-risk.  Based upon the evidence, the Court finds that WCP was

relying almost exclusively on Debtor's divorce settlement for repayment of the two-year

$13,065,000 loan.

> The foregoing finding is consistent with that of Karas:

>> We saw her as the probable individual that would be repaying the debt
>> based on reading all the documentation that we had read. We also read where
>> there was a judgment that had been essentially levied against her subsequent to
>> this date that would indicate that she was a primary obligor. So we concluded that
>> she was the primary obligor and probably likely to pay the debt.

Cook, during her testimony regarding Debtor's solvency, criticized Karas's conclusions

on this point, arguing Karas should have considered the primary security, the probability that

Montana Specs, LLC, Monarch GoBuild Construction, LLC, Gobuild, Inc., and Blue Sky

Development, LLC would default on the loan, and the probability that Crocker would not satisfy

the remainder of the loan.  The Court finds that it was Karas, and not Cook, who fully considered

and appreciated such factors.  Based upon the testimony of Adams and Bailey, and the evidence,

the Court agrees with Karas's expert opinion that Debtor's liability for her guarantee was the full

amount of the loan, or $13,065,000.

In exchange for the guarantee, WCP argues Debtor received "value" when she signed the

guarantee because $4,002,334.96 of the loan proceeds were used to pay off American Bank's

first position lien on Lot 176.  WCP's argument is not persuasive because Debtor was not

personally liable on the American Bank obligation and more importantly, during the loan

process, Debtor lost the ownership interest she had in Lot 176 when it was transferred to

Montana Specs.

In June of 2007, Debtor owned 100% of Monarch Design, LLC, which in turn owned 45% of Monarch GoBuild Construction, LLC.   In early June 2007, Monarch GoBuild Construction, LLC owned Lot 176.  The parties agree that the spec home on Lot 176 was under construction in June of 2007.  After WCP foreclosed on Lot 176, WCP spent, to the best of Adams's recollection, $150,000 to $200,000 to finish the home.  In a complicated transaction that included many aspects, WCP received just a little over $5.6 million from CrossHarbor for Lot 176.  However, in June of 2007, Adams believed the as-if-completed value of Lot 176 was something in the neighborhood of $7 million.  Assuming WCP spent $200,000 to finish the home on Lot 176 and assuming the completed value of the home on Lot 176 was, as argued by Adams, $7 million, Debtor gave up approximately $1,258,949.27 ($7,000,000.00 less $4,002,334.96 and $200,000.00, multiplied by Debtor's 45% interest) in value in Lot 176 when Monarch GoBuild Construction, LLC transferred Lot 176 to Montana Specs, LLC.

Debtor's guarantee of Crocker's loan from WCP was akin to a gift that enabled Crocker to secure the loan from WCP and shore up his finances, at least for a short period of time.  The sole value of the guarantee to Debtor was a mother's satisfaction in helping her child.  Debtor's guarantee of the loan, however, did not provide Debtor with any other "value," particularly from the standpoint of Debtor's creditors.

However, even if Debtor did in fact receive some value from her guarantee, which the Court finds she did not, the next inquiry is whether the value Debtor purportedly received was roughly equivalent to the $13,065,000 obligation for which she was liable.  *See BFP Resolution Trust Corp.*, 511 U.S. at 540 n.4 ("Our discussion assumes that the phrase 'reasonably

49

equivalent' means 'approximately equivalent,' or 'roughly equivalent.'").

In the case of *In re Maddalena*, 176 B.R. 551 (Bankr. C.D.Cal. 1995), the bankruptcy court explained that "[i]n making [a § 548(a)(1)(B)(i) value] determination, the analysis is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost.  This is so because the policy behind section 548 is to preserve the assets of the estate."  176 B.R. at 554-55 (*quoting In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir. 1991).  In many recent cases construing reasonably equivalent value under § 548(a)(1)(B)(i), the issue was whether the price received at a foreclosure sale constituted reasonably equivalent value.  *In re Fritz*, 225 B.R. at 224-25; *BFP v. Resolution Trust Corp.*, 511 U.S. at 545, 114 S.Ct. at 1765.   In such instances, so long as all the requirements of the State's foreclosure law have been complied with, a foreclosure sale cannot be set aside as a fraudulent conveyance unless there were irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law.  *Id.*; *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir.1995), *cert. denied*, 516 U.S. 1074, 116 S.Ct. 778, 133 L.Ed.2d 730 (1996).  While Samson takes issue with WCP's disposition of Debtor's assets, whether such sales satisfied the requirements of Montana or California foreclosure law is of no importance to the question of whether Debtor received reasonably equivalent value for her loan guarantee on June 15, 2007.

In sum, nothing in the evidence shows that Debtor received anything that this Court could construe as reasonably equivalent value in exchange for her guarantee of Crocker's loan from WCP.  From the standpoint of Debtor's creditors, Debtor did not receive any benefit, be it direct or indirect, in exchange for her guarantee.  *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 578-

79 (7th Cir. 1998).

      **b.**    **Solvency**

      The Bankruptcy Code defines the term "Insolvent" as a "(A) . . . financial condition such

that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation,

exclusive of -- (i) property transferred, concealed, or removed with intent to hinder, delay, or

defraud such entity's creditors . . . ."  11 U.S.C. § 101(32).  Samson and WCP, through their

experts, agree that a person is insolvent if he or she fails any one of three solvency tests, namely,

the Balance Sheet Test, Cash Flow Test, or Adequate Capital Test.  Karas, after examining

Debtor's financial position as of June 15, 2007, concluded Debtor was insolvent on that date

under all three of the solvency tests.  Conversely, Cook concluded Debtor was solvent under all

three of the solvency tests.  The particular point of disagreement between Karas and Cook

centered around what assets and liabilities should be included in the solvency analysis.  Karas did

not consider community property in his analysis, but looked only at Debtor's personal liabilities

and the personal assets over which Debtor had control on June 15, 2007.  Cook, in contrast, first

considered all assets that had been awarded to Debtor under Mini Settlement One, and then made

further adjustments to Debtor's balance sheet to include Debtor's "vested 50 percent interest in

the community property."  For the reasons discussed below, the Court finds that such issue is not

determinative under the facts of this particular case.

      For purposes of the Balance Sheet Test, and under the plain language of §§

548(a)(1)(B)(ii)(I) and 101(32), this Court must assign a value to Debtor's assets and liabilities

and then determine whether the value of Debtor's assets exceeded her liabilities.  "Debt" means

liability on a claim.  11 U.S.C. § 101(12).  "Claim" means "(A) right to payment, whether or not

such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."  11 U.S.C. § 101(5).  Furthermore, while "[t]he concept of transfer is controlled by Federal law[,]" "for fraudulent transfer purposes, state law determines the extent of a party's interests in property and when such interests expire." *In re Pepmeyer*, 275 B.R. 539, 543 (Bankr. N.D.Iowa 2002).  *See also Nobelman v. American Savings Bank*, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.'  *Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). *See also Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992)").

WCP argues that one-half of the marital estate should be included in Debtor's solvency analysis.  Samson counters that only the property which Debtor controlled on June 15, 2007, should be considered in the solvency analysis.  The particular date in time that is relevant to Debtor's solvency analysis is June 15, 2007.  As the Court will discuss below, regardless of whether the Court considers only the assets over which Debtor had control or one-half the community assets, Debtor was insolvent on June 15, 2007.

Karas agreed that Debtor's "control" of an asset was arguably not a factor under the general balance sheet concept, but explained that control is a critical factor when looking at solvency because all three solvency tests come back to what an asset can generate in terms of cash on a forward looking basis.  Karas explained that cash flow, and in particular, future cash flows "are the most important determinant as to your ability to repay debts and to meet scheduled obligations" because, according to Karas,

what we became painfully aware of [in the late 1980s and early 1990s] is that, really, the solvency standards dealt with future operating cash flows, so you had to do a complete analysis of the future operating cash flows to determine whether somebody was solvent. You couldn't simply look at their balance sheet at any one point in time and determine whether the entity was solvent.

In determining whether Debtor was solvent under the Balance Sheet Test, Karas excluded the community property that was under Blixseth's control because, as Karas explained, those were not assets that Debtor could convert to capital. Consistent with Karas's theory, one court explained, "[b]ecause '[a] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time,' ' '[a]sset valuation ... should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts.' .'" *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defs. (In re WRT Energy Corp.)*, 282 B.R. 343, 370 (Bankr. W.D.La. 2001) (quoting, *Trans World Airlines, Inc.*, 134 F.3d at 194 (3d Cir.1998)).

Cook testified a debtor could obtain capital in one of three ways; through operations, borrowing, or equity financing. On June 15, 2007, the majority of the community property was under Blixseth's sole management and control and, therefore, Karas testified that Debtor could not convert the community property into capital. As a consequence, Karas considered only those assets under Debtor's personal control because Debtor could not use the community property for operations, as collateral for borrowing, or for equity financing. Excluding the community property that was under Blixseth's sole control, Karas concluded that as of June 15, 2007, the value of Debtor's personal assets totaled $16,470,848.00 and Debtor's personal liabilities totaled $21,516,000.00. Karas wrote in his May 2, 2011, letter to Samson that "[t]he result of our analysis is that Ms. Blixseth failed the Balance Sheet Test as to solvency and was insolvent by

approximately $5 million in June of 2007 upon consummation and execution of the Western Capital Partners guarantee."

Cook, on the other hand, believed Debtor had assets worth $377,003,858 on June 15, 2007, which assets were offset by liabilities totaling $204,119,334. Cook's source of information regarding the value of the community property was taken from a document prepared by Blixseth in June of 2007 in connection with the divorce proceeding.

While completing her solvency analysis, Cook did not consider whether any of the community assets were income generating. For instance, Cook, while considering one-half of the marital assets in her balance sheet analysis, ignored completely the fact that the Yellowstone Club – the marital asset which supposedly had the most value – was in serious financial trouble and in June of 2007, lacked the ability to generate any cash flow from assets. Karas found it important to analyze whether particular assets would generate cash or whether they would require cash to maintain and operate. None of the assets under Debtor's control on June 15, 2007, and none of the assets that Debtor received under the MSA, were generating cash from operations. Rather, all the assets were requiring large amounts of cash to operate and maintain.

Additionally, Cook criticized Karas for failing to use professional skepticism when he reviewed documents, such as declarations, that were prepared after June 15, 2007. Cook explained that such documents were "filed not specifically for the purpose of documenting historical circumstances[,]" but rather, were "filed with the Court for the purpose of eliciting a result." Interestingly, the Court finds that it was Cook who failed to apply professional skepticism to values assigned to marital assets by Blixseth in his June 2007 declaration. Contrary to Cook's belief, Karas questioned and tested the veracity of the documents and

declarations upon which he relied.

Cook also criticized Karas for considering the full amount of Debtor's guarantee of the WCP loan as a liability of Debtor. Cook explained:

> The valuation of the contingent liability needs to account for several different factors, including the value of the primary security, the probability that the primary borrower -- borrowers would default on the loan, the possibility that -- or the probability that the other guarantor, Matthew Crocker, would not satisfy the remainder of the, of the loan. And so there were a lot of factors that needed to be weighed in order to get to a valuation, and Mr. Karas didn't consider any of those factors.

Similarly, WCP argues in its post-trial brief that "Karas unabashedly ignored the fact that there were four primary borrowers, two guarantors, approximately $18 million in primary collateral security for the $13 million obligation, but nevertheless valued Edra's guaranty at the full amount of the loan." Interestingly, before the promissory note matured, WCP was looking to Debtor for payment on the obligation, as evidenced by the complaint it filed against Crocker and Debtor in Colorado.

Nevertheless, as the Court explained earlier, Karas did consider several factors before concluding that Debtor was, in all likelihood, the person who WCP would have to look to for payment of the loan obligation. Once again, it was Cook who failed to consider the factors that impacted the probability that Debtor would be the person who would ultimately have to pay the WCP obligation.

For the reasons discussed above, the Court finds that Karas reached the correct conclusion as to whether Debtor was solvent, under the Balance Sheet Test, on June 15, 2007. The methodology used by Karas was reasonable and appropriate. The Court would also note that neither Cook nor Karas considered Debtor's pending tax obligations of $74,153,807.32 on June

55

15, 2007, because such obligations did not appear on any of the documentation that was provided to either expert.  Adopting Karas's sound reasoning, the Court finds that the value of Debtor's liabilities exceeded her assets by at least $80 million.  As a consequence, Debtor was insolvent on June 15, 2007.

Cook described the Cash Flow Test under § 548(a)(1)(B)(III) as "whether the debtor intended to incur or believed that she would incur debts beyond her ability to repay."  Cook considered Debtor's testimony that she intended to repay her debts as they matured "pretty good proof" that she did not intend to incur or believed that she was incurring debts beyond her ability to repay.  Cook was also convinced that Debtor was solvent under the Cash Flow Test "[b]ased on her spending habits, based on the affidavit that she signed in connection with the extension of the loan, and based on what I understand to be her testimony in this courtroom, I believe that she intended to pay all of her creditors."

Cook explained that the adequate capital test of § 548(a)(1)(B)(ii)(II) "examines whether or not the transaction left the debtor with insufficient capital to continue normal business operations."  According to Cook,

> there's three different ways that you can get capital: You can get it through operations, which is the cheapest way to get it, but that would be through selling inventory and conducting, you know, your normal operations; you can get it through borrowing, which is more expensive than getting it through operations, but that still provides capital, continuing operations; or you can get it through, through equity financing, which would be the most expensive way to get capital, but it is still an avenue for getting capital.

Debtor was, in Cook's opinion, solvent under the Adequate Capital Test because Debtor still had the ability to borrow money with which to fund her day-to-day operations.  Similarly, in an August 2011 report prepared for WCP, Patten, MacPhee & Associates, Inc. wrote: "Based on our

conclusions above regarding her balance sheet and cash flow solvency, it is our opinion that she also meets the Adequate Capital Test."

Karas claims Cook did not perform the Cash Flow Test or the Adequate Capital Test. Karas agrees with Cook that the "Cash Flow Test determines if the debtor will have incurred debts or obligations beyond its ability to pay them as they mature[.]" However, Karas relied on statements made by Debtor on May 30, 2008, to test whether Debtor was paying her debts as they matured in June of 2007, and concluded that Debtor did not have the ability to repay her debts as they matured. In contrast, Cook focused solely on the intent language of § 548(a)(1)(B)(i) to summarily conclude that Debtor was solvent. The Court agrees with Karas and finds that, given the circumstances, Debtor reasonably should have believed that she was incurring debts beyond her ability to repay as they became due in June of 2007. *See In re WRT Energy Corp.*, 282 B.R. at 415 ("While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured.")

Cook's conclusions that Debtor was solvent under the Adequate Capital Test was based upon her opinion Debtor was solvent under the Balance Sheet Test and the Cash Flow Test. The Court disagrees with Cook's opinion of Debtor's solvency under the Balance Sheet Test and Cash Flow Test. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (Instructing that "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it.*)* Therefore, the Court also rejects Cook's opinion that Debtor was solvent under the Adequate Capital Test.

Karas persuasively testified that a solvency analysis should always start by looking at an entity's operating or future cash flows in order to ascertain the supportable level of debt.  In 2007, Debtor had $2 million per month negative cash flow, which Karas characterized as a huge unrecorded liability.  The fact that Debtor could still borrow money after June 15, 2007, did not alter Karas's opinion because, according to Karas, "the borrowing of additional funds is not . . . a substitute for operating cash flows[.]" Karas noted that "there was never any operating cash flow in [Debtor]'s hands at any point that [he] could find."  Debtor's sole source of cash in 2007 was through the sale of assets, which merely "reduce[d] her committed obligations."

WCP complains that Karas failed to properly consider the May 24, 2007, letter Debtor's attorney William S. Ryden of Jaffe & Clemens in Los Angeles, California sent WCP's counsel. The Court finds no merit in such complaint.  When discussing the importance of the letter during cross-examination, the following exchange took place between Karas and WCP's counsel:

| | |
|---|---|
| WCP's Counsel: | Well, it's obvious now that that had no basis in reality, but on June 15, 2007, wouldn't you agree that that had some basis in reality? |
| Karas: | I wouldn't agree that it had any basis in reality, even on June 15, 2007. |

The expectation had no basis in reality because in 2007, Debtor and her counsel were relying on values that Blixseth assigned to assets, which values, according to Karas were "pie-in-the-sky projections."  "Because [a debtor's cash flow] projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance.  Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses.... However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate

58

fluctuations and general economic downturns, and otherwise incorporate some margin for error."

*Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073 (3rd Cir.1992) (internal

citations omitted).  As another court reasoned,

> '[u]nreasonably' small capitalization need not be so extreme a condition of
> financial debility as to constitute equitable insolvency...." *Murphy v. Meritor*
> *Savings Bank ( In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr.D.Mass.1991)
> (quoting *Metro Communications*, 95 B.R. 921, 934 (Bankr.W.D.Pa.1989) *rev'd on*
> *other grounds*, 945 F.2d 635, 650 (3d Cir.1991)). " '[U]nreasonably small
> capitalization encompasses financial difficulties which are short of equitable
> insolvency or bankruptcy insolvency but are likely to lead to some type of
> insolvency eventually.' "

*Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Sav. Bank (In re*

*Toy King Distributors, Inc.)*, 256 B.R. 1, 142 (Bankr. M.D.Fla. 2000).

Karas also explained that when an entity becomes a losing entity, instead of an entity with

a positive cash flow, that its value can be converted from what is known as a going-concern

value to a liquidation or non-going-concern value.  In other words, a radical change in income or

expenses can cause a radical shift in an asset's value.

In 2007, none of the assets Debtor ultimately received under the MSA, such as

BLX–which owned both the Yellowstone Club and Porcupine Creek– were experiencing positive

cash flows.  Thus, according to Karas, the final division of community property in August of

2008 exacerbated Debtor's cash-flow issues because Debtor simply took on more assets that

required even larger amounts of cash to maintain and operate.  One such asset that provided no

cash flow, but instead required a large amount of cash to maintain on a monthly basis was

Porcupine Creek.  Dozier appraised Porcupine Creek several times.  At the request of WCP,

Dozier did a retroactive appraisal of Porcupine Creek and concluded it was worth $207 million.

Dozier, however, did not consider whether Debtor or Blixseth could actually sell the property, and Dozier testified he did not consider the income approach when he did his appraisal because Porcupine Creek had no income-producing ability.  Dozier also conceded that his opinion of value would be impacted if the hypothetical seller was in distress.

Karas referred to Debtor as "the very definition of 'insolvency' in that negative cash flow is the definition of -- your ability to repay debts isn't determined by your ability to borrow more and -- against those debts; it's actually the ability to repay the debt."  Karas's testimony regarding Debtor's solvency on June 15, 2007, was credible, thorough and reliable.

WCP's post-trial memorandum begins: "The Trustee's Memorandum continues the fiction that [Debtor], one of the *Forbes' 400* wealthiest Americans in 2007, was insolvent during that very same year."  That statement is particularly interesting because as discussed earlier, WCP was claiming in Adversary Proceeding No. 09-00100 that Debtor was insolvent on June 15, 2007.  It was not until October 26, 2010, only five days after Samson commenced this Adversary Proceeding, that WCP agreed to dismiss Adversary Proceeding No. 09-00100, obviously recognizing it would be judicially estopped from prosecuting its claims in that Adversary Proceeding and defending this Adversary Proceeding.

"The purpose of fraudulent transfer law is to prevent a debtor from transferring away valuable assets in exchange for less than adequate value, if the transfer leaves insufficient assets to compensate honest creditors."  *In re Bay Plastics, Inc.*, 187 B.R. at 322.  As further explained in *Bay Plastics*, "[t]here are three kinds of financial distress that make a transaction a fraudulent transfer: (a) a transfer while a debtor is insolvent or that renders a debtor insolvent; (b) a transfer that leaves a debtor undercapitalized or nearly insolvent (*i.e.*, with insufficient assets to carry on

its business); (c) a transfer when the debtor intends to incur debts beyond its ability to pay. ”  187 B.R. at 322-23.  Despite what people might have believed, or what was published in *Forbes* magazine, the reality is that Debtor did not, on June 15, 2007, have sufficient assets to support the life she was living or to carry on any type of business.  In WCP's opinion, Debtor was too big to fail.  However, WCP's opinion in June of 2007 was based on unreliable and untested information.

Samson has demonstrated his right to set aside Debtor's guarantee of the WCP loan under § 548.  Thus, Samson is entitled to "recover, for the benefit of the estate, the property transferred, or, . . . the value of such property[.]" 11 U.S.C. § 550; *In re Acequia,* 34 F.3d at 809.

In this case, WCP, believing it had a valid lien on Debtor's personal property and the Bellevue condominium, has sold numerous assets at foreclosure sale.  Under his § 548 claim, Samson seeks damages in the amount of $6,504,461.72, or in the alternative, damages in the amount of $13,965,144.17 as set forth in WCP's proof of claim.  The Trustee's claim for damages in the amount of $6,504,461.72 is based upon interest payments made by Debtor on the guaranty obligation in the amount of $311,409.06; $45,200.63 for the funds WCP garnished from Debtor's Wells Fargo account; transfer of Debtor's condominium in Bellevue, Washington valued at $1,741,259.03; transfer of personal property located at Debtor's condominium in Bellevue, Washington valued at $52,733.00; transfer of Debtor's jewelry at Rancho Mirage valued at $97,552.00; transfer of Debtor's personal property located at the Yellowstone Mountain Club valued at $256,308.00; transfer of CrossHarbor Capital Partners contract claims for $250,000.00; transfer of Lot 176 from Monarch GoBuild Construction LLC to Montana Specs LLC for the benefit of Western Capital valued at $3,500,000; and transfer of Sandoval

61

contract claims for $250,000.00.  Samson also seeks the return of "[p]roperty transferred on August 24, 2010, including Edra's interests in BLX Group, Inc. Blixseth Family Investments, LLC, Monarch Designs, LLC, and various contract claims, including the Sandoval claims."

WCP disputes Samson's claim of damages, first arguing that Samson is not entitled to any recovery relating to the transfer of Lot 176.  WCP claims it thought the issues surrounding Lot 176 had to do with whether Debtor received reasonably equivalent value and Samson's damage claim.  WCP contends Samson cannot pursue that claim without joining Monarch Design, Monarch Go Build and Montana Specs, which entities were part of the transfer.  WCP also contends Samson did not give proper notice that he was challenging the transfer of Lot 176. In the approved final pretrial order, the parties agree: "11. Monarch GoBuild owned certain real property located at 49 Travertine Rd, Big Sky, MT 59716 f/k/a Lot 176 at the Yellowstone Club ("Lot 176")... [and] 13.  On June 15, 2007, Montana Specs granted a mortgage on Lot 176 to Western Capital to secure the Loan."  In addition, Samson, in his calculation of damages, asserts damages of $1,416,449.27 relating to "Transfer of Lot 176 from Monarch GoBuild Construction LLC to Montana Specs LLC for the benefit of Western Capital[.]"

Rather than elevate form over substance, the Court finds it appropriate to dispense with the structure of the transactions and evaluate the net impact on Debtor.  In conjunction with the loan, WCP required that Lot 176 be put in a special purpose entity.  As part of that process, Debtor did not object to Monarch GoBuild Construction, LLC transferring ownership of Lot 176 to Montana Specs.  That transfer resulted in Debtor, through Monarch Design, LLC, relinquishing her ownership interest in Lot 176.  As calculated earlier, that transfer, done at the request of WCP, resulted in a loss of $1,258,949.27 to the Debtor.

62

WCP also argues that any judgment entered in favor of Samson should be reduced by all WCP's expenses and fees incurred in conducting its foreclosure sales, property maintenance, disposition costs, etc.  WCP offered very little evidence of its expenses and fees incurred in conducting its foreclosure sales, maintaining property, or disposing of assets.  Consequently, except as discussed below, the Court declines to reduce Samson's judgment by such amounts. With respect to Lot 176, Adams testified that WCP spent $150,000 to $200,000 to finish the home on Lot 176.  The Court's damage calculation of $1,258,949.27 gives WCP credit for the money WCP spent to finish the home and make it marketable.

WCP, relying on the Ninth Circuit Court of Appeals' decision in *In re Taylor*, 599 F.3d 880 (9th Cir. 2010), also argues that Samson "cannot seek a mix of remedies[,]" but must instead decide whether he wants the property transferred or the value of such property.  WCP also argues in its Post-Trial Memorandum that "the question is how much WCP would have loaned in exchange for the Edra's personal property security interest."  WCP's own witnesses testified that WCP would not have loaned the money to Crocker and his entities, absent Debtor's guarantee. However, that misses the point and WCP misconstrues *Taylor*.

In *Taylor*, the debtors granted a bank a security interest in a single vehicle and the bank perfected its security interest 21 days after debtors purchased the vehicle.  *Id.* at 883.  The debtors sought protection under the Bankruptcy Code and the trustee in that case sought to avoid the bank's lien as a preferential transfer.  After determining that the bank's perfection of its interest in the debtors' vehicle was a preference, the bankruptcy court in *Taylor*, instead of converting the vehicle loan into an unsecured debt, left the bank's security interest intact and directed the bank to pay the debtors' bankruptcy estate the value of the security interest, which the bankruptcy

court determined was the full value of the initial loan. *Id.* at 884. On appeal, the Ninth Circuit

explained that "[t]he net result was that (1) the bankruptcy estate was allowed to keep the car and

the original loan obligation of $18,020 used to purchase the car; (2) USAA was allowed to keep

its valid lien, or security interest, in the car; (3) USAA was ordered to loan the bankruptcy estate

another $18,020; and (4) USAA received an unsecured claim against the estate for the fresh loan

of $18,020. At the end of the day, USAA was both a secured creditor (against all, including the

bankruptcy estate) for one loan of $18,020 (less the payments the Taylors had made) and an

unsecured creditor for another, new debt of $18,020." *Id.* at 886-87.

The Ninth Circuit reversed the bankruptcy court's decision and remanded the matter so

the bankruptcy court could declare the bank's security interest void, which would convert the

bank's secured claim into an unsecured claim. *Id.* at 885. The Ninth Circuit also remanded the

matter so the bankruptcy court could determine whether the bank had to return the pre-petition

payments it had received from the debtors. *Id.*

The Ninth Circuit explained in *Taylor*,

> The purpose of § 550(a) is "to restore the estate to the financial condition it would
> have enjoyed if the transfer had not occurred." *E.g., Aalfs v. Wirum ( In re
> Straightline Invs., Inc.)*, 525 F.3d 870, 883 (9th Cir.2008) (internal citations
> omitted). A bankruptcy court ordinarily determines the value of the property to be
> the value at the time of the transfer, but has discretion on how to value the
> property so as to put the estate in its pretransfer position. *Joseph v. Madray ( In re
> Brun )*, 360 B.R. 669, 674 (Bankr. C.D.Cal. 2007) ("Typically, courts equate
> 'value' with the fair market value of the subject property at the time of the
> transfer."). In this case, the bankruptcy court held correctly that awarding the
> estate the value of the security interest would more closely restore the estate to its
> pretransfer position than simply avoiding the transfer.

*Taylor*, 559 F.3d at 890. According to another court, "[p]reservation is automatic, while

recovery is not. Recovery is necessary only when the remedy of avoidance, and therefore of

preservation, is inadequate." *Rodriguez v. Daimlerchrysler Fin. Services Americas LLC (In re Bremer)*, 408 B.R. 355, 358-59 (10th Cir. BAP 2009).

The Court agrees that *Taylor* applies in this District to a security interest in a single piece of collateral that is still in a debtor's possession. For example, if Debtor's Bellevue condominium was still in Debtor's possession, the Court could set aside WCP's lien. Samson could then liquidate the condominium for the benefit of the creditors. However, WCP has already liquidated the condominium. Thus, the best and only way this Court can restore the bankruptcy estate to its pretransfer position is to award Samson the money WCP received from the sale of the condominium. WCP is not, as it argues, paying twice for one loan and such remedy is not a "forced loan." With respect to items which WCP has already sold, the Court finds that the appropriate remedy is judgment against WCP for the monetary benefit it received from the sale of such assets.

However, in the case of assets still in WCP's possession, the Court finds that the appropriate remedy is the return of such assets to Debtor's bankruptcy estate, such as Debtor's interest in BLX, BFI, and the letter agreement with Sandoval. In the case of property that is returned to the bankruptcy estate, the Court agrees with WCP that Samson is not entitled to an additional monetary damage associated with such property.

The Court rejects WCP's argument that Samson's failure to act under 11 U.S.C. § 362(h) precludes this Court from setting aside WCP's lien against Debtor's personal property. Section 362(h) only terminates the automatic stay with respect to personal property of the estate or of the debtor securing in whole or in part a claim. By setting aside Debtor's guarantee, Debtor's personal property no longer secures WCP's claim, and as a result, WCP can no longer claim the

65

stay terminated automatically under § 362(h).

Citing *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and Tech. Group, Inc. ("Agretech"),* 916 F.2d 528, 531 (9th Cir.1990), WCP also raises the affirmative defense of good faith under § 548(c). The defense set forth in § 548(c) applies to the extent a "transferee or obligee gave value to the debtor in exchange for such transfer or obligation." In *Agretech*, the debtor made a fraudulent transfer to one of its investors Palm Seedlings–A. The Court in *Agretech* concluded that the transfer of funds from the debtor to Palm Seedlings–A was avoidable because the good faith exception did not apply. *Id*. at 539–40. In a later decision, while discussing *Agretech*, the Ninth Circuit explained:

> [W]e addressed only "reasonably equivalent value" in terms of the "equity interest" created by the capital contributions made by the limited partners. We did not address any rescission or restitution rights held by the limited partners.
>
> In the end, we allowed the Trustee to avoid the transfers to the limited partners because the transfers were merely a receipt of money on account of the limited partners' equity interests held because of their capital contributions.

*In re AFI Holding, Inc.*, 525 F.3d 700, 705 (9th Cir. 2008). After carefully reading *Agretech, Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991), and *AFI Holding, Inc.*, 525 F.3d 700, the Court finds that the good faith defense is barred in this case.

In all, the Court finds that the Trustee is entitled to recover the sum of $4,013,410.99 from WCP. The foregoing amount is based on the amounts WCP received upon the liquidation of Lot 176, the Bellevue condominium, Debtor's personal property at the Bellevue condominium, the funds WCP garnished from Debtor's Wells Fargo account, the sale of Debtor's jewelry at Rancho Mirage, the sale of Debtor's personal property at the Yellowstone Club, CrossHarbor Capital Partner's contract claims, and the interest Debtor paid to WCP. The

66

foregoing amount does not include damages for the Sandoval contract claims, but the Court would direct that WCP return such claims to Samson.  In addition to the foregoing, the Court orders WCP to return to Debtor's bankruptcy estate all of the "[p]roperty transferred on August 24, 2010, including Edra's interests in BLX Group, Inc. Blixseth Family Investments, LLC, Monarch Designs, LLC, and various contract claims.  The only contract claims WCP need not return to Samson are the CrossHarbor Capital Partner's claims because the Court awarded Samson monetary damages for such claims.

## 2.    Count Three: Preferences (11 U.S.C. §§ 547 and 550)

While the Court's damage award above includes $45,200.63 for the amount WCP garnished from Debtor's checking account on or about February 12, 2009, Samson also seeks to avoid that garnishment as a preferential transfer under § 547.  Section 547(b)[23] empowers a trustee to avoid certain transfers made by a debtor within the 90 days preceding the filing of the

---

[23]     Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made-
　　(A) on or within 90 days before the date of the filing of the petition; or
　　(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if-
　　(A) the case were a case under chapter 7 of this title;
　　(B) the transfer had not been made; and
　　(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

petition in bankruptcy.  A trustee must establish seven conditions to prove a voidable preference under § 547(b):

> (1) a transfer
> (2) of the debtor's property
> (3) to or for the benefit of a creditor
> (4) for or on account of an antecedent debt
> (5) made while the debtor was insolvent
> (6) within 90 days of the filing of the petition in bankruptcy
> (7) that enables the creditor to receive more than he or she would under a Chapter 7 liquidation.

*United States v. Daniel (In re R & T Roofing Structures & Commercial Framing, Inc.)*, 887 F.2d 981, 984 (9th Cir. 1989).   In order to prevail, the trustee, as plaintiff, must prove each and every element set forth under § 547(b).  *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988) ("The burden of proving the existence of these elements is on the bankruptcy trustee") (citing *Grover v. Gulino (In re Gulino)*, 779 F.2d 546, 549 (9th Cir. 1985)).

The evidence shows that WCP obtained a default judgment against Debtor in the amount of $13,298,628.18 on January 23, 2009.  As a result of that default judgment, WCP garnished $45,200.63 from Debtor's checking account on February 12, 2009.  Debtor's bankruptcy petition was filed on March 26, 2009.  Factors one, two, three, four and six are satisfied and no further discussion is necessary.

As discussed above, the Court finds that Debtor was insolvent at all times between June 15, 2007, and March 26, 2009.  The Trustee has satisfied his burden as to factor five.  Samson testified that Debtor's bankruptcy estate is financially insolvent.  WCP has not disputed such fact.  Consequently, the Court funds that when WCP garnished Debtor's bank account, it

68

received more than it would have in Debtor's Chapter 7 liquidation case.  Samson is entitled to

his requested relief under § 547.  However, because the Court is already awarding Samson the

garnished funds under his § 548 claim, the Court is not again awarding the same funds as

damages for Samson's § 547 claim.

**3.      Count Six (Usury)**

In the Final Pre-Trial Order filed May 30, 2012, Samson argued that Montana law applied

to his usury claim, while WCP argued that Colorado law applied.[24]  In his post-trial brief filed

August 13, 2012, Samson once again argues "Montana law applies . . . since the nexus of the

loan transaction was in Montana."  In its post-trial brief filed September 4, 2012, WCP discussed

only Montana law.  The Court finds that WCP has abandoned its argument that Colorado law

should apply.  WCP instead argues in its post-trial memorandum that:  (1) because of the default

judgment entered by the Colorado District Court on January 22, 2009, in the amount of

$13,298,628.13, Samson is barred by the doctrine of issue preclusion from now raising a usury

claim; (2) it is the judgment and not the promissory note that is accruing interest; and (3) under

*Hanson v. Bonner* (1983), 202 Mont. 505, 510 661 P.2d 421, 424, Samson must prove that WCP

intended to charge usurious interest.

With regard to WCP's issue preclusion claim, 28 U.S.C. § 1738 requires this Court, as a

matter of full faith and credit, to apply the relevant state's preclusion principles.  *Gayden v.*

---

[24]  Federal courts in diversity cases apply the choice-of-law rule of the state in which they
sit.  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir.1990) (citing
*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).
*See also, Van Gundy v. Freeport Indonesia*, 50 F.Supp.2d 993 (D.Mont. 1999) ("A federal court
sitting in diversity must apply the choice of law rules of the forum state to determine which
state's substantive law applies.").

*Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 800 (9th Cir. 1995).  The default judgment at issue

originated in Colorado and thus, the issue preclusion principles of Colorado govern.  *Cal-Micro,*

*Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1123 (9th Cir. 2003).  In Colorado, the burden of

establishing the preclusive effect of a prior judgment rests on the party seeking to invoke it.

*Hansen v. Jones*, 168 P.2d 263, 265 (Colo.1946); *Waitkus v. Pomeroy*, 506 P.2d 392, 395 (Colo.

Ct.App.1972), *rev'd on other grounds*, 517 P.2d 396 (Colo.1973).

> Under Colorado law, issue preclusion bars re-litigation of an issue if:
>
> (1) the issue is identical to an issue actually litigated and necessarily adjudicated
> in the prior proceeding; (2) the party against whom estoppel was sought was a
> party to or was in privity with a party to the prior proceeding; (3) there was a final
> judgment on the merits in the prior proceeding; and (4) the party against whom
> the doctrine is asserted had a full and fair opportunity to litigate the issues in the
> prior proceeding.

*Rantz v. Kaufman*, 109 P.3d 132, 139 (Colo. 2005); *Bebo Constr. Co. v. Mattox & O'Brien, P.C.*,

990 P.2d 78, 84-85 (Colo. 1999).  The Supreme Court of Colorado, discussing issue preclusion

and claims preclusion, explained in *Rantz v. Kaufman*:

> The doctrine of issue preclusion, sometimes referred to as collateral
> estoppel, provides that a court's final decision on an issue actually litigated and
> decided in a previous suit is conclusive of that issue in a subsequent suit.
> *Carpenter v. Young*, 773 P.2d 561, 565 (Colo.1989).  Preclusion can also occur
> under the theory of res judicata, or claim preclusion.  Claim preclusion "bars
> relitigation of claims or issues which were or could have been raised in a prior suit
> between the same parties." *Id*. at 565 n. 5.  Issue preclusion, on the other hand,
> can prevent "relitigation of a factual or legal matter that was previously litigated
> and decided," in an earlier matter.  *Id*. Thus, "[issue preclusion] is broader than
> [claim preclusion] since it applies to claims for relief different from those litigated
> in the first action, but narrower in that it only applies to issues actually litigated."
> *City and County of Denver v. Block 173 Assocs.*, 814 P.2d 824, 831 (Colo.1991).

109 P.3d at 138-39.

> WCP argues in its post-trial memorandum that Debtor "did not assert a usury defense in

the district court action, which would have been compulsory, barring a usury defense in this action under the doctrine of issue preclusion." WCP is only claiming that Samson's usury claim is barred by the doctrine of issue preclusion, and not the doctrine of claim preclusion. As explained in *Rantz v. Kaufman*, the doctrine of issue preclusion only applies to issues actually litigated.

"An issue is actually litigated when it is properly raised, by the pleadings or otherwise, submitted for determination, and determined." *Negron v. Golder*, 111 P.3d 538 (Colo. App. 2004). In *Nichols v. Board of County Commissioners of the County of La Plata, Colorado*, 506 F.3d 962, 968 n.1 (10th Cir. 2007), the Circuit Court noted that "[o]n at least two occasions, the Colorado Supreme Court has cited comment e as support for its collateral estoppel jurisprudence." Comment e of the RESTATEMENT (SECOND) OF JUDGMENTS § 27 reads:

> [i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

The Colorado District Court's default judgment entered against Debtor on January 22, 2009, makes no determination as to whether the promissory note at issue was usurious. WCP's claim that Samson's usury claim is barred by the doctrine of issue preclusion thus fails.

The Court similarly finds no merit in WCP's argument that it is the default judgment and not the promissory note that is accruing interest. The default judgment should be accruing interest at the federal rate from January 22, 2009. However, it is the promissory note, and not the default judgment, that determined the interest rate that is reflected in the $13,298,628.13 judgment.

71

Next, citing *Hanson v. Bonner, supra,* WCP argues Samson must prove that WCP intended to charge usurious interest.  On the issue of intent, the Montana Supreme Court explained in *Scarr v. Boyer*:

> The only intent required for usury is the intent to charge a particular rate of interest that is usurious in fact.  *Montana National Bank of Bozeman v. Kolokotrones* (1975), 167 Mont. 92, 535 P.2d 1017. The creditor need not know that the particular interest rate is usurious and illegal. Thus, whether Scarr intended to violate the law is irrelevant. It is enough that he intended to charge 18 percent. We hold that the District Court was correct in penalizing Scarr for usury despite his assertions that he did not intend to violate the law.

*Scarr v. Boyer* (1991), 250 Mont. 248, 253, 818 P.2d 381.  *See also, Bowden v. Gabel* (1938), 105 Mont. 477, 76 P.2d 334, 337 ("it is well settled that the voluntary taking of more than the legal rate of interest constitutes usury. The only intent necessary is the intent to take more interest than the law permits. Usurious intent is implied if excessive interest is intentionally taken.")

Turning to Samson's claim, MONT. CODE ANN. ("MCA") § 31-1-107 provides:

> (1) Parties may agree in writing to the payment of any rate of interest that does not exceed the greater of 15% or an amount that is 6 percentage points per year above the prime rate published by the federal reserve system in its statistical release H.15 Selected Interest Rates for bank prime loans dated 3 business days prior to the execution of the agreement. Interest must be allowed according to the terms of the agreement.

> (2) A loan that is not usurious when made is lawful for the duration of the loan, provided the loan agreement is not substantially changed. This subsection does not apply to loan renewals.

In Montana, interest is "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money and includes loan origination fees, points, and prepaid finance charges, as defined in 12 CFR 226.2.[25]"  MCA § 31-1-104.  Montana law further

---

[25]  Prepaid finance charges are defined as "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit

provides that nonregulated lenders may not charge a rate of interest that exceeds fifteen percent

or which is six percentage points above the New York prime rate as reported in the Wall Street

Journal three business days before the transaction in question.  MCA § 31-1-107.  The prime rate

of interest on June 15, 2007, was 8.25 percent.  An interest charge in excess of that allowed by

MCA § 31-1-107 is usurious.[26]  MCA § 31-1-108.  In this case, the interest charged by WCP is

usurious if it exceeds 15% per annum.

Consistent with MCA § 31-1-104, this Court held in *Brummer v. TMG Life Ins. Co., Inc.*

*(In re Brummer)*, 11 Mont. B.R. 287, 147 B.R. 552 (Bankr. D. Mont. 1992), that additional fees

and charges, such as finance charges and origination fees, which are deemed to constitute

"interest", should be added to the stated amount of interest agreed upon by the parties when

computing whether a contract contains a usurious rate of interest.  This does not mean, however,

that every fee or charge is considered interest for "it is equally well settled that 'a lender may

properly exact from a borrower, in addition to interest at the highest lawful rate upon the money

lent, reasonable fees or compensation for services rendered, or reimbursement of expenses

---

at any time."

[26] Usury is statutorily defined as "[t]he taking, receiving, reserving, or charging" of an interest rate greater than the limit set by MCA § 31-1-107.  MCA § 31-1-108.  On the subject of usury, the Supreme Court of Montana writes:

> It is, of course, elementary that "a contract or obligation for the payment of a sum of money larger than that actually lent to or due from the debtor is usurious if the difference between the face amount of the obligation and the sum actually received or owed by the debtor, when added to the interest, if any, stipulated in the contract, exceeds the return permitted by law upon the sum actually so received or due."

*Bowden v. Gabel*, 76 P.2d at 336.

incurred, in good faith, by the lender or his agent, in connection with the loan, without thereby rendering the transaction usurious, even though the services rendered or acts done be such as would ordinarily be performed by the lender in his own interest." *Bowden v. Gabel*, 76 P.2d at 336.

In *Brummer, supra,* this Court also adopted the spreading doctrine, which allocates the total interest provided for in a loan agreement over the full term of the loan. Thus, the Court specifically rejects any interest rate calculation which does not spread the origination fees and other such charges over the full terms of the loans.

The face amount of the promissory note at issue is $13,065,000.00. The promissory note contained an 11% rate of interest and a 15% default interest. In addition to the stated interest, WCP charged an origination fee of $783,900.00. The term of the loan was 24 months. By August of 2008, the borrowers had defaulted on the note and WCP sent letters to Debtor demanding the 15% rate of interest. WCP also filed an action in Colorado against Debtor and Crocker. WCP obtained a default judgment against Debtor and Crocker on January 22, 2009.

WCP's Exhibit 57 reflects that WCP calculated the interest, including the origination fee, as totaling $3,583,979.84 through March 26, 2009, Debtor's petition date. WCP also calculated the weighted average of the loan balance as $12,551,750.39 during the 730 day period of the loan. That same exhibit reflects that up to the point WCP secured its default judgment, Debtor and Crocker had made principal payments on the promissory note totaling $12,129.83. Based upon WCP's calculations, the ending balance due under the promissory noted as of June 14, 2009, was $13,793,246.90. As of August 7, 2009, when WCP filed its proof of claim, WCP was claiming it was owed $13,965,144.17, which amount includes an unspecified amount of

attorneys' fees.  Per its Calculation of Interest Rate, WCP then divided $3,583,979.84 by the weighted average loan balance of $12,551,750.39, to obtain a rate of 29%.  WCP then divided 29% by 730 and then multiplied that result by 365 to obtain an interest rate of 14.28%.  Per the Calculation of Interest Rate, WCP also calculated the maximum allowable interest under the promissory note, and determined that such amount was $3,765,525.12.  Testing WCP's assumptions, counsel for Samson subtracted 80 days, which was the period of time between Debtor's petition date and the maturity date of the loan, from 730, to obtain a number of 650, which is the number of days over which WCP based its interest calculation of $3,583,979.84.  If the Court calculates the interest rate to Debtor's petition date and uses the figure of 650, the Court obtains an effective interest rate of 16.034%.  The increase in the interest rate is due to the fact that WCP's model accrues interest to March 26, 2009, but spreads the interest calculation out to June 14, 2009.

WCP argues in part that the above interest calculation stems from the default judgment and not the promissory note.  To account for such argument, the Court subtracted from $3,583,979.84 – WCP's figure for total interest and fees charged during the loan term – the interest charged by WCP for the last week of January 2009, all of February 2009 and the first 26 days of March 2009.  The Court's rough interest calculation for such period is $386,696.55.  Subtracting $386,696.55 from WCP's figure of $3,583,979.84 reveals that WCP is claiming that interest totaled $3,197,286.29 from the date of the loan to January 22, 2009, the date default judgment was entered.  Dividing $3,197,286.29 by WCP's weighted loan balance of $12,551,750.39, reveals a total interest rate of .254728.  Dividing the foregoing number by 587 – the number of day between June 14, 2007, and entry of default judgment -- and multiplying that

number by 365 yields an effective interest rate of 15.84% per annum.  Comparing apples to apples, the interest rate charged to Debtor, according to WCP's own data, is usurious.

The Court would note that as a result of the default judgment, in a Report to Court filed March 29, 2010, WCP claims it is entitled to the following: April interest of $172,415.59; May interest of $174,570.78; June interest of $121,618.59; July interest of $117,008.62; August interest of $117,533.16; September interest of $115,982.55; October interest of $117,432.33; November interest of $113,689.73; and so on through April 1, 2010.  The foregoing interest amounts are, as WCP argues, interest associated with the default judgment, and not the promissory note.

MCA § 31-1-108 authorizes the assessment of a penalty for usury and an action to recover excessive interest.  It provides:

> (1)The taking, receiving, reserving, or charging a rate of interest greater than is allowed by 31-1-107 must be considered a forfeiture of a sum double the amount of interest that the note, bill, or other evidence of debt carries or that has been agreed to be paid on the note, bill, or other evidence of debt.

> (2) When a greater rate of interest has been paid, the person by whom it has been paid or the person's heirs, assigns, executors, or administrators may recover from the person, firm, or corporation taking, receiving, reserving, or charging interest a sum double the amount of interest paid, provided that the action must be brought within 2 years after the payment of the interest, and provided that, before any suit may be brought to recover the usurious interest, the party bringing suit makes written demand for return of the interest paid.

WCP's promissory note provides for a default interest rate of 15%, in addition to the $783,900.00 origination fee and the interest reserve.  Montana's usury statute at MCA § 31-1-108(1) includes not only the charging of a usurious rate but also "reserving" such rate in written notes.  In *Anderson v. Traveler's Ins. Co.*, 13 Mont. B.R. 91 (D. Mont. 1993), Judge Hatfield

76

held:

> Mont. Code Ann. § 31-1-108, provides that a party commits usury if it engages in the:
>
> > "taking, receiving, reserving, or charging a rate of interest greater than is allowed by 31-1-107 . . . ."

This statute applies in the disjunctive. If Travelers *either* charges usurious interest, *or* reserves (*i.e.* contracts for) usurious interest, the penalty provisions under § 31-1-108 are triggered. When the latter occurs, the note is usurious on its face. Although the Andersons' amended complaint appears to allege only a wrongful charging of interest, both theories of liability are advanced in the Andersons' briefs, and discussed by the bankruptcy court. Since Travelers raises no objection to the unpled theory of liability, and specifically requests this court to address both theories, each is discussed below. The court raises this issue only to point that a claim based upon an unlawful "charging" of usurious interest is separate and distinct from a claim alleging an unlawful "reserving" of usurious interest. The distinction is insignificant in the instant case since Travelers in liable under either theory.

However, a corollary to the above rule on "reserving" interest by contract is that the lender has the right to unilaterally invoke and revoke the delay interest provisions. In fixing damages in *Anderson v. Travelers*, the Montana Federal District Court notes, as did the bankruptcy court [in *Anderson v. Travelers Ins. Co. (In re Anderson)*, 10 Mont. B.R. 256, 272 (Bankr. Mont. 1992)], that "due to Travelers' unilateral reduction of the delay interest rate to 17%[27] effective October 21, 1991, post-acceleration delay interest must be adjusted downward to reflect this reduction in the delay rate." 13 Mont. B.R. at 113, fn. 29. This is consistent with *Scarr v. Boyer*, 250 Mont. 248, 818 P.2d 381, 383 (1991), where the Supreme Court noted that the lender abandoned its claim for delay interest at the pre-trial proceeding and thus stopped the default interest penalty from running. *Scarr* holds that where the lender charges post-default

---

[27] This rate was lawful at the time under MCA § 31-1-107(1) since the prime rate was 11 percent.

usurious interest during any period of time after default, such charges violate the usury law only for the period of time the post-default charge is made and the penalty is to be applied to the interest charged during that term. *Id.* at 383. Following *Scarr*, Judge Hatfield noted in *Anderson* that Travelers had the right "to take precautions to minimize its exposure to usury penalties" by lowering the delay interest rate on the notes to levels consistent with MCA § 31-1-107.

In this case, WCP claims it is now only charging interest under the default judgment. However, WCP has not amended its claim to remove the pre-default judgment usurious interest charge. Based upon WCP's own calculations, the interest it charged up to the date of the default judgment was $3,197,286.29, which as discussed above, yields an effective annual interest rate of 15.84%.

In *Confederated Tribes of Grand Ronde Community of Oregon v. Quantum Five, Inc.* (2004), 321 Mont. 396, ¶ 18, 91 P.3d 1255, the Montana Supreme Court noted that,

> § 31–1–108(1), MCA, authorizes the forfeiture of a sum double the amount of a usurious interest rate which a note carries or which has been agreed upon by the parties. To calculate this forfeiture, or usury penalty, it is necessary to ascertain the inclusive dates during which the usurious interest rate applied. Montana case law has identified two dates that can be used in this calculation—the maturity date of a term loan or the trial date on a demand loan.

The Court in *Confederated Tribes* also noted that "courts may consider equitable principles when deciding usury cases." *Id.* at ¶ 21. Crocker and Debtor made payments to WCP totaling $1,450,726.55. Of the foregoing amount, $1,438,593.72 was allocated to interest and $12,129.83 was allocated to principal. Under Samson's fraudulent transfer claim, the Court awarded Samson money damages of $4,013,410.99, of which $356,609.69 was attributable to interest payments made by Debtor, either voluntarily or by garnishment. The Court finds it would be inequitable to award Samson twice the interest paid by Debtor as a usury damage and award

Samson another $356,609.69 under his fraudulent transfer claim.  For his usury claim, the Court awards Samson $356,609.69.

**4.      Allowance of WCP's Proof of Claim**

The allowance of WCP's Proof of Claim is problematic because WCP failed to attached a detailed accounting to its proof of claim.  Furthermore, the skeletal accounting that is attached does not appear to have any relation to WCP's Loan Activity & Interest Calculations.

It is well settled under Federal Rule of Bankruptcy Procedure 3001(f) that a proof of claim completed and filed in accordance with 11 U.S.C. § 501 and any applicable Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim.  Thus, if a procedurally proper claim is filed, an objecting party carries the burden of going forward with evidence contesting the validity or amount of the claim.  *In re Weber*, 16 Mont. B.R. 49, 56 (Bankr. D. Mont. 1997); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991).  Once an objecting party succeeds in overcoming the *prima facie* effect given to the claim by Rule 3001(f), the burden shifts to the claimants to prove the validity of their claims by a preponderance of the evidence.  *In re Allegheny Int'l, Inc*. 954 F.2d 167, 173-74 (3rd Cir. 1992).

In this case, Samson has presented sufficient evidence to overcome the *prima facie* effect given to WCP's claim by Rule 3001(f).  Thus, the burden shifted to WCP to prove the validity of its claim by a preponderance of the evidence .  Other than the default judgment and vague testimony, WCP has not proved the validity of its claim.  On Debtor's petition date, WCP, per its calculation of interest rate, alleged that Debtor and Crocker owed a principal amount of $11,659,993.61.  Excluding Debtor's property, WCP's Loan Activity & Interest Calculations show principal payments totaling $4,913,888.53.  Subtracting the foregoing amount from the

principal loan amount of $11,659,993.61 leaves a claim still owing of $6,746,105.08. WCP's proof of claim is allowed as a general unsecured claim for the foregoing amount of $6,746,105.08.

In accordance with the foregoing, the Court will enter a separate order and judgment as follows:

IT IS ORDERED that the deposition transcripts of Jory Russell, together with the counter designations filed by WCP, are admitted into evidence.

IT IS FURTHER ORDERED that Plaintiff's Objection to Western Capital Partners, LLC's is sustained in part; and Western Capital Partners, LLC's Proof of Claim shall be allowed as a $6,746,105.08 general unsecured claim.

IT IS FURTHER ORDERED and ADJUDGED that Judgment is entered in favor of the Plaintiff, Richard Samson, and against the Defendant, Western Capital Partners, LLC; and pursuant to 11 U.S.C. § 548, Samson is awarded the sum of $4,013,410.99, and WCP is ordered to return to Debtor's bankruptcy estate all of the "[p]roperty transferred on August 24, 2010, including Edra's interests in BLX Group, Inc. Blixseth Family Investments, LLC, Monarch Designs, LLC, and various contract claims. The only contract claims WCP need not return to Samson are the CrossHarbor Capital Partner's claims because the Court awarded Samson monetary damages for such claims.

IT IS FURTHER ORDERED and ADJUDGED that Judgment is entered in favor of the Plaintiff, Richard Samson, and against the Defendant, Western Capital Partners, LLC; and pursuant to 11 U.S.C. § 547, the amount of money WCP garnished from Debtor's bank account on February 12, 2009, was an avoidable preference.

80

IT IS FURTHER ORDERED and ADJUDGED that Judgment is entered in favor of the Plaintiff, Richard Samson, and against the Defendant, Western Capital Partners, LLC; and on his claim for usury, Samson is awarded the sum of $356,609.69.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

81